The appellant, David Thomas Leitner, was convicted of the murder of Francis Craven, in violation of § 13A-6-2, Code of Alabama 1975, and was sentenced to life imprisonment.
A discussion of the facts is necessary for an understanding of this case. On January 7, 1989, Harold O'Quinn discovered a smoldering body in a field near his home in a rural area of Tuscaloosa County, Alabama. The corpse was lying face up, with its head resting on a large prayer book. A metal dog chain with a leather handle was lying beside the head of the corpse. The dog chain was intertwined with an electrical extension cord that was draped over the neck and extended over the arms and abdominal area of the corpse. The deceased's hands were bound with nylon rope and the feet were bound with wire. A roll of duct tape and its packaging were found next to the body.
On the evening of the day the corpse was discovered in Tuscaloosa County, Father Francis Craven, a Roman Catholic priest from Guntersville, Alabama, did not appear to conduct evening mass. He had taken a trip to Ft. Myers, Florida, and his return flight was scheduled to arrive at the Birmingham airport earlier on that day and he was to drive to Guntersville. At first, it appeared that Craven had not been on the flight, but it was later discovered that he had arrived in Birmingham on that flight under a false name.
On January 9, the corpse found in Tuscaloosa County was identified through dental records as Francis Craven. On January 13, Craven's van was found burned and in 2 feet of water on a logging road 12 miles from where the body had been discovered.
Although the investigation of the murder produced several suspects, it did not lead to a grand jury investigation until 18 months after the murder, when Gregory Scott Little implicated the appellant, David Thomas Leitner. They had had an argument, and Leitner had sworn out a warrant against Little for allegedly making death threats against him. No evidence was offered in this case to show the exact charge made in the warrant. Two months after Little's arrest, but before his trial on that charge, he told authorities that Leitner had murdered Craven. The state did not prosecute Little on the charge made by Leitner.
Around this time, Little was living with a married female parolee, Jeanine Coons Coker. Coker was arrested in Pensacola, Florida *Page 275 
for violating her probation. Little testified that he was contacted when she was arrested and was told that if he would provide information about Craven's death, she would be released. He did and she was, although her probation was eventually revoked for subsequent violations.
Only Little's story linked the appellant Leitner to Craven's murder. The following narrative, although often in conflict with Little's prior statements to police, is compiled principally from Little's trial testimony.
In 1986 and 1987, beginning when Little was 16 years old, he became a homosexual prostitute in Atlanta, Georgia, where he said he lived on the street. Little met Leitner in Atlanta at a bar called The Gallows. The Gallows was known as a meeting place for male homosexual prostitutes and those seeking them out. Leitner and Little went from the bar to a restaurant, where they talked. The appellant told Little that he was a retired colonel in the United States Army. Leitner asked Little to come live with him in his house in Guntersville, Alabama. They agreed that if Little did not like the arrangement that Leitner would give Little $200 to return to Atlanta.
In Guntersville, Leitner and Little lived together in a mobile home on Lake Guntersville and then in a duplex apartment in town. Little testified that they had a sexual relationship.
At some point, Vivian Young, an elderly woman, moved into the other side of the duplex. Leitner and she later married, despite a disparity in their ages. After the marriage, however, Leitner and Little lived together in one side of the duplex apartment and continued their homosexual relationship, while Ms. Young continued to live in the other side of the duplex.
In 1987 or 1988, Leitner, Little, and Ms. Young vacationed in Europe, using $25,000 of Ms. Young's money to finance the trip. While in England, they were joined by a friend of Leitner's and they all visited "gay" bars and nudist colonies. Leitner, Little, and Ms. Young traveled in Holland, Germany, France, and Italy before returning again to visit Leitner's friend in England.
Little testified that while they lived in Guntersville, he, Leitner, and Ms. Young attended St. Williams Catholic Church, where Father Francis Craven was the priest. They were all close friends with Craven and they usually went out to eat with him three or four times a week. Craven taught Little how to drive an automobile and took him to get his driver's license. Little testified that Craven's attentions inspired jealousy in Leitner. Once, Craven asked if Little could stay after mass and help him "clean the rectory." Leitner refused to let Little stay. After this incident, the relationship between Leitner and Craven cooled, according to Little.
Little testified that on the day that Craven was murdered, he and Leitner traveled in a pickup truck from Guntersville to Huntsville and then to Birmingham. Little said that they happened to see Craven near the Birmingham airport. Craven was driving his van. Little said that Leitner got Craven's attention and instructed Craven to follow them. Little said that as they drove, Leitner asked him if Craven was homosexual and if Craven had ever "tried anything" with him. Little denied that Craven had ever made any sexual advances toward him.
Little testified that Leitner then drove through Birmingham and the rest of Jefferson County, mainly on roads other than the interstate highway. He said that when they came to a rural area in Tuscaloosa County, Leitner stopped in a field. He and Little got out of his truck, and Craven got out of his van. Little said Leitner then accused him and Craven of having a sexual relationship, which they both denied. Then, according to Little, Leitner approached Craven and hit him on the head with a metal pipe, knocking Craven to the ground. Little said that he was frightened of Leitner at this time and that he returned to the truck. From there, he watched Leitner bind Craven's hands and feet and put him in the back of the van. Leitner then got in the truck with Little and drove to a gasoline service station where he purchased gasoline that he put in a metal can. Leitner and Little then returned to the field where they had left Craven in his van. Little said Leitner made him help move Craven out of the van. They took Craven from *Page 276 
the van and put him on a pile of brush. Little said that he saw the appellant hit Craven again, pour gasoline on him, and set him on fire.
Little testified that Leitner then got in Craven's van and told Little to follow him in his truck. They then went to a fast food restaurant where they washed blood from their hands and got something to drink. They left the restaurant and drove to a rural area and traveled down a logging road. Leitner stopped the van and burned it. Then they drove to Birmingham and then to Guntersville.
Leitner and Little then got ready to go to mass that evening. Little said that Leitner "pretended" to be concerned about Craven because Craven had not arrived to conduct mass. He said that Leitner pretended to search for Craven that night.
Little testified that some months later, after they had moved from Guntersville to Atmore, Alabama, Leitner and Ms. Young legally adopted him, with his consent. The homosexual love affair between Leitner and Little began to deteriorate, and they frequently argued. Little then moved out of the "family" home. In May 1990 Leitner swore out a warrant for Little's arrest. Little's trial was set for July 1990, and in June 1990 he began relating this story concerning Craven to law enforcement officers.
 I
The appellant first contends that the circuit court erred in refusing to receive into evidence several handwritten pages from a journal found in a locked closet in Craven's residence after his death. The appellant contends that the court erred in finding that the journal pages were not relevant.
One of the appellant's defense theories was that Craven was murdered by someone other than himself who was involved with Craven in sadomasochist sex that went further than intended. The appellant sought to introduce the journal pages, along with some related paraphernalia, into evidence to demonstrate the feasibility and plausibility of this theory.
The six-page journal excerpt that the court refused to receive into evidence was in the form of a letter describing a violent sexual fantasy, revealing tendencies towards humiliation, bondage, dominance/subservience, coprophilia, masochism, sadism, transsexualism, and transvestitism, and infantilism. In order to address the legal issue presented in this case, it is necessary to quote from this sordid excerpt:
"Troy,
 "I am the queer you put in handcuffs and drove from Nashville the other day. You really took charge of the situation when you placed the key to my handcuffs in your pocket and started to humiliate me.
 "Little did I know what you were going to do as you stopped at the store and purchased a magic marker and then grabbed a hold of my hair while you painted 'FAGGOT' on my forehead. Then you hung a sign around my neck saying 'give me what I deserve' and made me walk around that truck stop. Many men spit in my face, some kicked me real hard in the a___, three shoved me to my knees and made me suck their d___ right outside on the parking lot in public. They even stripped me down to my underpants and threw my clothes in the trash while you stole everything out of my wallet and threw it in the trash along with all my personal identification. Then you tied a leash around my p____ my balls.
 "You took all my money and bought some whiskey. You put me back in the car and drove off into the woods, where you pulled a gun on me and stuck the barrel in my mouth and held it there for a long time with the hammer cocked until you felt I was certain you would kill me if I did not totally obey you. You then cuffed my hands behind my back and tied my ankles together and shoved me on my face on the ground. Then you ripped off my underpants threw them away. You made me eat some dirt and swallow it.
 "You kept on drinking your whiskey making all kinds of threats about what you would do to me for being a faggot — like f___ing me and making me lick your a___ clean and making me suck your d___. Suddenly you dropped your pants and p___ all over me. Then you squatted *Page 277 
down and s___ on the ground. Then you dragged me to your s___ and made me eat it. At first I refused but I quickly obeyed and ate your s___ after you pointed your gun and shot into the ground very close to my head.
 "By this time you had already rifled my belongings in the car and found my diaper and rubber pants. You flipped me over on my back and put some diapers and rubber pants on me and promised to further embarrass me for being a baby. But meanwhile you dropped your pants again and took them off and sat on my chest, rubbing your balls and p____. You teased me with them by dragging them across my face, under my nose, and over my lips. I wanted very badly to take your balls into my mouth and suck on them but you held off for a long time making me squirm and moan with unbelievable passion and desire. But still you would not let me have them. You told me I was nothing but a piece of s___ and that was all I deserved to have in my mouth. You proved that point by sitting on my face and making me open my mouth real wide and eat more of your s___ as it came right out of your a___hole! Then I had to lick your a___ clean. Then you moved back and knelt over my chest again. You squeezed on my cheeks, forcing my mouth open and then you leaned over my face and spit into my mouth and made me swallow your spit. Then you teased me again with your p____ and finally jacked off on my face.
 "You then picked me up off the ground and threw me on the floor of the van and drove off, leaving all my clothes and other belongings there in the woods, except for diapers, rubber pants bottle. You blindfolded me and drove off all over the place to confuse me so I could never find my things again. Eventually you drove to the home of one of your buddies and carried me into his house. He laughed at me and made fun of me. Then you two sat down to eat. When I said I was hungry, your buddy asked if he could feed me and you said 'O.K.' Then he told you that a baby like me could not swallow adult type food, that it needed to be ground up for them. He then proceeded to fill his mouth with food and chewed it up real good. Then he forced my mouth open and spit all that food into my mouth and made me swallow it. Other than a baby bottle full of p___, that's the only way I got fed for several days.
 "Your buddy also strapped a dildo around my waist with the dildo up my a___ and you both made me sleep that way all night so I would be ready for the two of you to f___ me each morning. And that's exactly what you did each day. I would be handcuffed to the head of the bed in such a way that I could be flipped over on my back or my stomach according to your friends' pleasure. You invited all the guys at work to come by and have their pleasure with your captive queer on their way to work or on their way home. Consequently, I was forced to suck their d___ or get f___ed by them every morning and every evening. And, during this 2nd week I was forcibly introduced to two new experiences, gang-banging and finger f___ing.
 "The third week you invited the girls at work to come over and 'see the queer.' But before they came you put makeup on my face, including lipstick. You had a hairdresser come over and put my hair up in curls. Then you tied me spreadeagled on the bed and shaved my whole body clean like a girl's. Then you put diapers and rubber pants on me and some panty-hose after that. Then you put a padded bra on me and felt me up like I was a girl, french-kissing me, stroking my lips and playing with my crotch and my a___. Finally you untied my hands and put a slip and a dress on me. Then you tied my hands together and my ankles together, pulled down my panty hose and my diapers, lifted my dress and f___ed me in the a___, making me beg for you to keep pounding my a___ with your p____ and balls until you came inside of me. 'Now you're my personal bitch,' you said 'I own your a___!'
 "In the sixth week you made me eat the p____ of all the girls who came over and you allowed them to rape me by forcing me to have intercourse with them.
 "Finally the ultimate humiliation. You whipped my a___ until I signed a blank *Page 278 
permission form for surgery. I was taken to the hospital handcuffed to a gurney and taken to a private room on the psych ward and handcuffed in a bed. In the morning a male nurse came and shaved me all over for surgery. Then I was given a shot 
passed out. When I awoke, I was still handcuffed to the bed, but I was in a women's ward. I was soon to learn that I had had a sex change operation and now had a c_____ where my balls and p____ had been. I was made into a girl. A girl your friends had free access to whenever they wanted to f___ some girl. And from that day on every one of your friends who wanted some tits 
a___ came and went and f___ed me and felt me all up like a whore. Some of them even bit my neck 
gave me hickeys. In fact you have even forced me to be a prostitute on the streets so you can keep all the money. Once I tried to run away and you caught me and beat me up so now I won't ever do that again.
 "You also feel you have the right to screw me any time you wish — and you do it any where you feel like it."
The court refused to allow this excerpt to be received into evidence, and stated for the record that its primary reason for refusing to allow the excerpt was that it was not relevant to the case, that the writing had not been authenticated, and that the evidence was "prejudicial." We will address each of the grounds stated by the court in support of it's ruling.
 A.
The court ruled that the journal excerpt was not relevant to the case. Evidence, however, is relevant and admissible "if it has any probative value, however slight, upon a matter in the case." C. Gamble, McElroy's Alabama Evidence § 21.01(1) (4th ed. 1991); Peeples v. State, 601 So.2d 186, 187
(Ala.Cr.App. 1992).
 "Evidence is relevant if it has 'any tendency to throw light upon the matter in issue, even though such light may be weak and falls short of demonstration.' McCain v. State, 46 Ala. App. 627, 247 So.2d 383 (1971); Austin v. State, 434 So.2d 289 (Ala.Cr.App. 1983). 'Any fact which has causal connection or logical relation to another fact, so as to make the other fact either more or less probable, is competent or relevant.' Hurst v. State, 397 So.2d 203 (Ala.Cr.App.), cert. denied, 397 So.2d 208 (Ala. 1981); Waters v. State, 357 So.2d 368 (Ala.Cr.App.), cert. denied, 357 So.2d 373 (Ala. 1978)."
Mitchell v. State, 473 So.2d 591, 594 (Ala.Cr.App. 1985).
Evidence suggesting that someone other than the appellant may have killed Craven is relevant evidence. The journal excerpt, which was found in Craven's locked closet, was the basis of the appellant's defense that someone else had killed Craven during sadomasochist sex. There was evidence that the journal had been in Craven's exclusive possession. Investigators of the murder found the journal, along with sexual paraphernalia. Diapers, handcuffs, masks, and rope were all discovered, along with the journal, in the locked closet. A locksmith had to be called to gain entry to the closet.
While the journal excerpt did not exactly describe the events surrounding Craven's death, some of the descriptions of various forms of humiliation, bondage and sadomasochism are very similar. Craven's body was found in the woods with his hands and feet bound. There was an electric cord around Craven's neck that was connected to a dog leash. While the details of the sexual fantasies described in the journal are not identical to the state in which Craven's body was found, a jury might find a compelling parallel between the events described in the journal and the state of Craven's body when it was discovered. It is possible that, given access to the journal excerpt, the jury could reasonably infer that the killing was the result of a sadomasochistic sexual adventure that went wrong when the sadist carried the event to the ultimate conclusion of murder.
Article I, section 7, of the Constitution of Alabama, provides a defendant with the right to be heard and to present his own defense. Ephraim v. State, 627 So.2d 1102
(Ala.Cr.App. 1993). The journal excerpt was essential to the appellant's defense. It suggested Craven may have desired to be involved, and *Page 279 
may have been involved in voluntary sadomasochist sex when he was killed. If he suffered from these desires, then he might have sought out an amenable partner. Thus, this excerpt was relevant to the central issue of this case: whether the appellant killed Craven. Although the determination of questions of relevancy is said to be within the trial court's discretion where the wording of questions is at issue, the laws of evidence control, and trial courts have the duty to apply the laws of evidence. This was not a matter of the mere wording of a question.
 B.
The appellant was not given the opportunity to present evidence that the handwritten journal excerpt was written by Craven. The appellant's counsel informed the court that he had samples of Craven's handwriting for comparison with the excerpt but that he did not have a handwriting expert to testify at trial. The testimony of a handwriting expert, however, is only one method by which handwriting can be authenticated. "[T]he genuine specimen may be submitted to the jury for comparison with the disputed writing even though no witness has made a comparison of such writings." C. Gamble, McElroy's AlabamaEvidence § 111.01(2) (4th ed. 1991). Section 12-21-39, Code of Alabama 1975, provides:
 "In any proceeding before a court or judicial officer of the state where the genuineness of the handwriting of any person may be involved, any admitted or proved handwriting of such person shall be competent evidence as a basis for comparison by witnesses or by the jury, court or officer conducting such proceeding to prove or disprove such genuineness."
We hold that the court erred in excluding the excerpt on the basis of lack of authentication, where the court would not permit a comparison of the excerpt with the known handwriting samples of Craven.
 C.
The court commented that the journal excerpt was overly prejudicial. In fact, the only "prejudicial," detrimental, or unfavorable impact the excerpt would have would be as to the victim, Craven.
The circuit court erred to reversal in finding that the journal excerpt was not relevant to this case, was not authenticated, and was more prejudicial than probative. The court's refusal to receive the excerpt into evidence destroyed any possible defense based on the theory that the crime was committed by another person engaged in a deviate sexual relationship with the deceased.
 II
The appellant also contends that the court erred in denying his motion for a judgment of acquittal. He contends that, if the facts were as Little testified, Little, the state's primary witness, would be an accomplice to the murder. He further contends that the state failed to present any evidence corroborating Little's testimony, as would be necessary if Little were an accomplice to the murder.
In denying the appellant's motion, the court stated that whether Little was an accomplice was a question for the jury and gave assurances that it would instruct the jury on the applicable law. The court, however, did not instruct the jury on the law regarding accomplice liability. It did not instruct the jury that corroborative evidence is essential if the only evidence connecting the accused to crime is the testimony of an accomplice. Had the appellant's counsel made timely objections to this fatal omission, our determination of this issue would also merit reversal.
As we do in every case, after considering all the facts and all the law, we ask if the appellant received a fair trial. David Thomas Leitner did not.
For the foregoing reasons, the judgment in this cause is due to be reversed and the case remanded to the Circuit Court for Tuscaloosa County for proceedings not inconsistent with this opinion.
REVERSED AND REMANDED.
All the Judges concur. *Page 280