824 So.2d 804 (1999)
Carey Dale GRAYSON
v.
STATE.
CR-95-1511.
Court of Criminal Appeals of Alabama.
November 19, 1999.
Rehearing Denied March 24, 2000.
*808 Virginia A. Vinson, Birmingham, for appellant.
Bill Pryor, atty. gen., and Tracy Daniel, asst. atty. gen., for appellee.
McMILLAN, Judge.
This case was originally assigned to another judge and was reassigned to Judge McMillan.
The appellant, Carey Dale Grayson, was indicted on two counts of capital murder. Count I charged the appellant with the intentional murder of the victim during a kidnapping in the first degree, in violation of  13A-5-40(a)(1), Ala.Code 1975. Count II charged the appellant with the intentional murder of the victim during a robbery, in violation of  13A-5-40(a)(2), Ala.Code 1975. The appellant pleaded not guilty and not guilty by reason of mental disease or defect. Following a trial, the appellant was convicted of capital murder as charged in Count I of the indictment and the lesser included offense of intentional murder as contained in Count II of the indictment. Thereafter, a sentencing hearing was held before the jury, and the jury returned an advisory verdict recommending that the appellant be sentenced to death, by a vote of 12-0 as to Count I. A *809 presentence report was presented at the separate sentencing hearing before the judge; thereafter, the appellant was sentenced to death by electrocution as to Count I; the appellant was sentenced to life imprisonment as to Count II.
The trial court made the following findings of fact concerning the crime and the appellant's participation in it:
"On the night of [February 21, 1994,] Vickie Deblieux, age 37, was dropped off by a friend on 1-59 near Chattanooga, Tennessee, to hitchhike to her mother's home in Louisiana.
"Four teenagers, the defendant, Kenny Loggins, Trace Duncan, and Louis Mangione, all who had been drinking alcohol and using drugs, saw her hitchhiking on 1-59 at the Trussville exit in Jefferson County, Alabama. They offered to take her to Louisiana; instead they took her to a wooded area, on the pretense of picking up another vehicle.
"After arriving in this area, they all got out of the vehicle, and began to drink. The defendant, along with the others threw bottles at Ms. Deblieux, who began to run from them. They tackled her to the ground and began to kick her repeatedly all over her body. When they noticed that she was still alive, one of them stood on her throat, supported by the Defendant, until she gurgled blood and said `Okay, I'll party,' then died.
"They then put her body in the back of a pickup truck and took her and her luggage to Bald Rock Mountain, after removing her clothing and a ring, and they played with her body and then threw her off a cliff.
"They then went to a car wash in Pell City to wash the blood out of the truck. After rummaging through her luggage, they hid the luggage in the woods.
"On their return to Birmingham, they took Mangione home and then returned to Bald Rock Mountain, where they began to mutilate the body by stabbing and cutting her 180 times, removing part of a lung, and removing her fingers and thumbs.
"The next morning defendant's girlfriend found the three of them in Birmingham asleep in the truck all covered in mud and blood. The defendant told her they got blood on them from a dog.
"On [February 26, 1994,] three rock climbers found Ms. Deblieux's body and called the police. Her body was taken to the medical examiner's office.
"The medical examiner found the following injuries; almost every bone in her skull was fractured, every bone in her face was fractured at least once, lacerations on the face over these fractures, a missing tooth, left eye was collapsed, right eye was hemorrhaged, tongue discolored, 180 stab wounds (postmortem), two large incisions in her chest, her left lung had been removed and all her fingers and both thumbs were cut off.
"The medical examiner opined that the cause of death was blunt force trauma to the head and that she was alive during the beating.
"All defendants were later arrested after Mangione began showing one of Ms. Deblieux's fingers to friends. "Defendant's Case:
"Ralph Wiley, the defendant's uncle testified that he was disabled because of a bipolar disorder, which is a prevalent disorder in the defendant's family. That Defendant's mother died when he was age three and his father has been married four or five times. He had not been around defendant in many years.
"Dora Roper, the defendant's second cousin testified that her mother had *810 mental problems for which she had to be hospitalized.
"Jan Arnett, testified that she was defendant's junior high school teacher when he was ages 13-16. That he was hyperactive in class, not interested in school, and wouldn't do classwork or homework.... She tried to get defendant's father to help the defendant. That defendant was not violent and knew right from wrong....
"Dr. Rebert, a forensic psychologist for the State of Alabama, Department of Mental Health, opined that the defendant at the time of the incident suffered from a mental disease or defect. She described this as a bipolar disorder and said he was in a manic state at the time of the incident; however, he did know the difference between right and wrong and was able to appreciate the nature and quality or wrongfulness of his acts.
"Dr. Goff, a private psychologist who opined that at the time of the incident the defendant suffered from a mental disease or defect, bipolar I disorder, which involves extreme mood swings. However, the defendant did know right from wrong but would not be able to respond to the rightness or wrongness of his acts.
"Jan Deblieux, the victim's mother testified that she was not involved in a lawsuit filed by her daughter's estranged husband."
The record further indicates that, although the investigation originally involved suspects in Chattanooga because the victim was from that area, the investigation eventually led the police to the Jefferson County jail, where the appellant was incarcerated. He was interviewed by the police at the jail where he agreed to give a statement, indicating that "they were not hanging this case on him and [he wanted] to tell his side of the story." The appellant then gave the following statement which was admitted at trial:
"Kenny, T.R., Louis and myself were all drinking very heavily when T.R. and Louis suggested that we get into a fight. We left and went riding around and found a hitchhiker at 1-59 exit in Trussville, Alabama. We picked her up and took her to the pipeline.... Medical Center East. We were all talking when she made a remark about killing us all when I threw a beer bottle at her, then Kenny hit her with his bottle, Louis hit her with his and T.R. with his. After that she began to run when Kenny got her in the back of the head with another bottle, causing her to fall. We all ran over and began to kick her and hit her. When she stopped moving, Kenny saw she was still alive and stood on her throat [until] she died. Then we took her to Pell City and left the body. We then went to the car wash and washed out the bed of Kenny's truck and we took Louis home. When we got back to my car, T.R. and Kenny asked me to show them the way to the body and I did. When we got there, T.R. and Kenny began to mutilate the body by cutting off the fingers and cutting open the stomach. T.R. had found a bottle and shoved it into the [vagina] while Kenny took out her eyes. After this we dumped the body and left for T.R.'s house. Kenny and I returned to my car and we went ... to Hardee's in Chalkville and all three of us fell asleep in the truck, where Kenny's girlfriend woke us up later that morning."
Upon further questioning, by the authorities, the appellant made other statements concerning the details of the offense. The appellant stated that while T.R. was standing on the victim's throat, he placed his hands on the appellant for balance. He further indicated that, when they dumped *811 the victim's clothes over the cliff, T.R. took some of the clothing and Kenny took a ring from the victim. The appellant indicated that he took nothing from her. The appellant was then asked why he and his accomplices had killed the victim; the appellant responded that he did not know why they had killed her, "but it was not his problem." The officer who took the appellant's statement noted that he was very cooperative and that his attitude was "almost one of humor. He had a smile during the entire time we were speaking with him."

I.
The appellant argues that the trial court committed reversible error by refusing to allow the defense to question a State's witness concerning a civil suit involving the appellant, because, he says, this questioning would have tended to show the bias of the witness. Specifically, the appellant argues that he was improperly prevented from questioning the victim's mother, Jan Deblieux, concerning a wrongful-death action that had been filed by the victim's estranged husband against the Miller Brewing Company. The appellant argues that the suit was being brought by the decedent's estate and that the decedent's mother clearly had a financial interest in the civil suit, and allowing him to question her about it would prove her bias in seeing that the appellant was convicted.
The record indicates that the victim's mother had testified during the State's case-in-chief to establish that the victim was her daughter, and had also testified that, just before the offense, the victim had telephoned her, stating that she would be traveling home to Louisiana very shortly, by bus or by plane. The witness further testified that she never heard from her daughter after that conversation. Thereafter, during the appellant's presentation of his defense, the victim's mother was called as a witness. She was asked whether she knew an attorney who had been hired by her daughter's estranged husband. She stated that she had not met with the attorney, nor had she participated in hiring him. Moreover, when asked if she was "familiar with the nature of the lawsuit filed on behalf on the decedent," the victim's mother responded that she had received "a pack like this," indicating a large stack of materials, but that she had "no idea what it means." The prosecutor objected to the questioning on the grounds of relevance and defense counsel asked to make a proffer as to what he expected the evidence to show. The trial court then allowed defense counsel to make his statement outside the presence of the jury. Defense counsel stated that they sought to admit a certified copy of the complaint and other papers in the lawsuit as well as testimony concerning it, because the lawsuit sought to hold Miller Brewing Company responsible for the victim's death, because the appellant and his accomplices were drinking Ice House beer to the point of intoxication which caused the death. Thus, defense counsel argued that the lawsuit, filed by the ex-husband, portrayed the death as caused by intoxication rather than by the appellant's "meanness" or as part of a satanic ritual, both of which were suggested as causes by the State's evidence. Defense counsel stated that convicting the appellant would further the victim's mother's cause in her lawsuit and therefore affected her bias and credibility, because she had a financial interest in the outcome of the criminal case. The prosecutor responded as follows:
"Well, I assume the theory upon which [defense counsel] suggests that this is admissible is to demonstrate some bias or prejudice on the part of this witness.

*812 "Now, if this were a situation where we had a witness who said, `I stood there and watched the defendant beat the victim in the head,' then he might have an argument to be made that she had a financial interest in the outcome of this case and therefore was shading her testimony to make the case come out like she wanted to. But what has she said other than as a corpus witness that the victim called her and said that she was coming home and she never heard from her again?"
Defense counsel responded that the mother's testimony went too farÔÇöshe was allowed to testify concerning the telephone call she had received from her daughter who wanted to come home. He argued that the witness was attempting to portray her daughter in a favorable light through the introduction of hearsay testimony concerning the telephone conversation. The prosecutor responded that the witness's statement concerning the victim's intentions was clearly admissible under Rule 803, Ala.R.Evid. The trial court refused to allow the certified copy of the lawsuit into evidence.
The testimony by the victim's mother identifying the victim and stating that her daughter had planned to return home was not improper. The trial court's failure to allow evidence of the civil suit and further testimony concerning this suit was also proper. Jan Deblieux's testimony identifying her daughter was clearly relevant, and her testimony concerning her telephone conversation with her daughter was also relevant because it helped to determine the timing of the victim's death, to explain the location of the crime, and to indicate that the victim did not willingly accept a ride going in a direction different from her destinationÔÇöLouisiana. In State v. Simmons, 955 S.W.2d 752, 766 (Mo. 1997), the appellant argued that the trial court had improperly allowed victim-impact evidence to be introduced during the guilt phase through the identification by the mother of the victim in several photographs, as well as the testimony of the victim's mother that she had not ordered the victim's son a birthday cake for his birthday. The Missouri Supreme Court stated:
"These arguments are frivolous. We cannot perceive any way that [the victim's mother's] identification of her daughter in two photographs constitutes victim impact evidence. Nor does the testimony concerning the ordering of the birthday cake fare any better. A full review of [the victim's mother's] testimony shows that the statement was made in the context of determining the timing of [victim's] death. [The mother] testified that [the victim] had not called the week of her son's birthday and that she had not ordered a cake because she was waiting for [the victim] to call."
Id., at 766.
Similarly, in Pinkney v. State, 538 So.2d 329, 338 (Miss.1988), vacated on other grounds, 494 U.S. 1075, 110 S.Ct. 1800, 108 L.Ed.2d 931 (1990), the appellant argued that the mother of the deceased had improperly testified concerning her daughter's background as well as her reaction at finding her daughter's body the morning after the murder. The Mississippi Supreme Court, however, found no error in this testimony, because it "was necessary to establish the identity of the deceased, the ownership of the house, and the facts and circumstances surrounding her discovery of [the victim's] body." Id., at 338. See also Smith v. State, 698 So.2d 189, 203 (Ala.Cr.App.1996), aff'd, 698 So.2d 219 (Ala.1997) ("There was evidence introduced that the victim was alive on August 31, 1984, was a wife and mother, and was working at Flowers Bait and Tackle Shop *813 to support her family. The prosecutor's remarks do not constitute victim impact argument as the appellant contends, but were a legitimate comment on the evidence." Id., at 203.).
Moreover, the victim's mother's testimony did not constitute impermissible hearsay because it was not introduced to prove the truth of the matter asserted. Rather, the testimony was admitted to prove the victim's intent, plan, or scheme, in hitchhiking at the time of the offense. "[A] statement may be admissible where it is not offered to prove the truth of whatever facts might be stated, `but rather to establish the reason for action or conduct by the witness.' Tucker v. State, 474 So.2d 131, 132 (Ala.Cr.App.1984), rev'd on other grounds, 474 So.2d 134 (Ala.1985). See also Tillis v. State, [469 So.2d 1367 (Ala. Cr.App.1985) ]." Edwards v. State, 502 So.2d 846, 849 (Ala.Cr.App.1986). See also Mason v. State, 768 So.2d 981 (Ala.Cr.App. 1998) (There was no error in an investigator's testimony as to the substance of his conversation with a "tipster" as "it was offered to explain [the investigator's] actions and the sequence of events following his conversation with the `tipster.'").
"`[M]any statements have been admitted as exceptions to the hearsay rule upon the rationale that such statements were admitted for some purpose other than to prove the truth of the statements.' Id. See also Clontz v. State, 531 So.2d 60, 61 (Ala.Cr.App.1988) (wherein a probation officer was allowed to testify that he first became aware the defendant was not at his address through a telephone call from the appellant's mother, because `the testimony was not introduced as proof of the matter asserted, but rather as the motive behind the probation officer's beginning his investigation'); Molina v. State, 533 So.2d 701, 714 (Ala.Cr.App.1988), cert. denied, 489 U.S. 1086, 109 S.Ct. 1547, 103 L.Ed.2d 851 (1989) (wherein a police officer was allowed to testify to information concerning a vehicle suspected to be involved in drug activity, received through a radio dispatch, because it was not offered to prove the truth of the contents of the dispatch, but `to explain the reason he pursued and subsequently stopped the defendant'); Petite v. State, 520 So.2d 207, 211 (Ala.Cr.App.1987) (a radio broadcast, stating that a burglary was in progress, was not hearsay as it was not introduced to prove the truth of the matter asserted, `but rather for the purpose of explaining why Officer Stafford went to the property'); Thomas v. State, 520 So.2d 223, 226 (Ala.Cr.App. 1987) (wherein an officer was allowed to identify people he spoke with and places he went before finding the defendant, because `[t]he fact of the conversations... was offered to explain the officer's actions and presence at the sceneÔÇönot for the truth of the matter asserted')."
Wilson v. State, 571 So.2d 1237, 1240-41 (Ala.Cr.App.1989), rev'd on other grounds, 571 So.2d 1251 (Ala.1990). See also Roper v. State, 695 So.2d 244, 246 (Ala.Cr.App. 1996).
Rule 803(3), Ala.R.Evid., establishes an exception to the hearsay rule where the out-of-court statement concerns the "[t]hen existing mental, emotional, or physical condition of the declarant." "A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health)," constitutes an exception to the hearsay. Charles W. Gamble, McElroy's Alabama Evidence (4th ed.1991),  262.01(1). Thus,
"[a] person's statement of his then existing design, intent, motive, emotion, and the like is admissible as tending to *814 show the existence in him of such intent, plan, motive or design. This is a generally recognized exception to the hearsay evidence rule and holds true though the declarant is neither a party nor the privy of a party to the action and though the declarant is a party who offers the statement in behalf of himself."
Id. "It has been recognized that a person's design, plan, or intent to do a certain act is relevant to prove that he did indeed do the particular act in question. Among the ways of proving that he had the design or plan is to show statements by him, prior to the claimed act, indicating that he had the design." McElroy's Alabama Evidence,  262.01(2). Thus, in the present case, the witness's testimony concerning the victim's statement of her plan, design, or intent to travel home was admissible and relevant to prove that she actually undertook a course of action in order to get home, specifically, hitchhiking with the appellant and his codefendants.
The trial court did not err by limiting the appellant's cross-examination of the victim's mother concerning the wrongful-death action, which was based on the same incident charged in the indictment. The appellant correctly refers to the rule of law that a witness in the prosecution of a criminal case may be cross-examined concerning a civil action for damages against the accused based on actions involved in the instant criminal case. Malone v. State, 358 So.2d 490, 492 (Ala. Cr.App.1978).
"In Ex parte Brooks, [393 So.2d 486, 487 (Ala.1980) ], our Supreme Court stated:
"`The case law of this state has consistently held the institution of a civil suit arising out of the same facts as a criminal prosecution to be within the permissible scope of cross-examination to show bias on the part of the witness. This rule is augmented by the public policy of this State as codified in Section 12-21-137, Code 1975, which mandates the right of every party to a "thorough and sifting" cross-examination of the opponent's witnesses.
"`The general rule, from which the more narrow rule here under consideration evolved, is stated in Green v. State, 258 Ala. 471, 64 So.2d 84 (1953):
"`"It is always competent on cross examination to make such interrogation of a witness as would tend to test his interest, bias, or prejudice or to illustrate or impeach the accuracy of his testimony."
"`In the discharge of its factfinding functions the jury's search for the truth includes the paramount right to consider a witness's motivation, and any evidence testing "his interest, bias or prejudice" so as to "illustrate or impeach the accuracy of his testimony" as a competent, material, and relevant subject of cross-examination, and the jury's right to be given such evidence is, of it self, part of the factfinding process.' (citations omitted)."
Reeves v. State, 432 So.2d 543, 545-46 (Ala. Cr.App.1983).
However, the factual situation in the present case is distinguishable in that the appellant was not prevented from questioning the witness concerning the civil suit; moreover, the witness's testimony in this case was not the sort that would be affected by bias. "The right of the accused to confront witnesses against him and, through reasonable cross-examination, place the witness in his proper setting and test the weight and credibility of his testimony has long been held essential to a fair trial. An accused should be allowed wide latitude in showing any fact which would tend to establish bias or interest on *815 the part of any witness testifying against him." Mullins v. State, 699 S.W.2d 346, 351 (Tex.App.1985) (citations omitted). "`Cross-examination [to elicit facts tending to show] motive, bias, interest and prejudice is a matter of right and may not be unduly restrictive.' ... `[R]estrictions on the scope of cross-examination are within the sound discretion of the trial judge ... but this discretion comes into play only after the defendant has been permitted cross-examination sufficient to satisfy the sixth amendment.'" State v. Reis, 33 Conn.App. 521, 525, 636 A.2d 872, 875 (1994) (citations omitted). "`As a rule, the extent of a cross-examination is within the Court's discretion, although it should be liberally allowed ... Nonetheless, the Court may restrict a cross-examination to evidence which is competent, material, and relevant, and "`when the examination has been carried as far as will serve to develop the issues involved and aid the search for the truth, we approve of the trial court curtailing the length and limit of examination.'"'" State v. Ballas, 180 Conn. 662, 676, 433 A.2d 989, 996-97 (1980) (the trial court permitted defense counsel to question the victim concerning the civil proceedings instituted against the appellant and the appellant was allowed to testify that he had received a collection letter from the victim's attorney, but the trial court properly refused to allow into evidence certain exhibits for the defense as well as questioning of the victim concerning the amount of damages sought). See also State v. Reis, supra (the appellant was allowed to show that the victim had brought a civil action against him for injuries arising out of the same conduct that resulted in the criminal charges and that he had hoped, as a result of the civil action, he would be reimbursed for his medical bills and pain and suffering but the trial court properly excluded a conversation between the victim and his attorney concerning the dollar amount sought). In the present case, the victim's mother testified that an action had been brought by the decedent's estate arising out of this same conduct against the Miller Brewing Company and that she had received the paperwork on the suit. There was no error in the trial court's excluding the copy of the complaint in the wrongful death action or any further questioning concerning the action as the appellant had already been allowed "to place his theory of bias before the jury on cross-examination." Mullins v. State, supra, at 351 ("if the victim had denied filing a civil lawsuit arising out of the assault, it then might have been proper to allow [further testimony]").
Moreover, the testimony by the victim's mother merely established the identity of the victim and indicated that she had telephoned concerning plans to return home. The subject matter of this testimony is not the sort that bias, even if present, would affect. "`The usual discretion vested in the trial court to control the cross-examination is narrowed in proportion to the extent of the adverseness of the testimony of the witness and the value to the defendant of a disaccredidation of the witness.' Hendrick v. State, 368 So.2d 576, 578 (Ala.Cr.App.), cert. denied, 368 So.2d 579 (Ala.1979). See also Ex parte Jenkins, 474 So.2d 140, 141 (Ala.1985)." Hodges v. State, 570 So.2d 1252, 1257 (Ala. Cr.App.1989). Furthermore, discrediting of this particular witness would not have benefitted the appellant's case. Clearly, as the mother of the victim of this horrific murder, the witness's bias was already clear to the jury. State v. Burris, 131 Ariz. 563, 567, 643 P.2d 8, 12 (1982) ("the motive and interest of [the victim] in the criminal prosecution is quite clear without the rejected testimony. He was chained up and shot at by appellant"). State v. Gunther, 39 Conn.Supp. 504, 507-08, 466 *816 A.2d 804, 807 (1983) ("The Court's ruling merely precluded the defendant from establishing what the Court could infer, i.e., that the victim of a crime which results in economic loss may be motivated to testify not only to see that justice is done but also to receive compensation from the criminal, whether it be by order of restitution or a subsequent civil suit.").
There was no error by the trial court in refusing to allow defense counsel to question the victim's mother concerning the civil suit or in allowing the victim's mother to testify concerning her telephone conversation with her daughter.

II.
The appellant argues that the trial court committed reversible error by denying his motion for a judgment of acquittal on the capital offense of murder during the course of a kidnapping because, he says, there was insufficient evidence to establish the underlying offense of kidnapping in the first degree. Specifically, the appellant argues that there was insufficient evidence to establish the necessary element of abduction and that the evidence indicated that the victim had been neither abducted nor restrained, but rather went with the appellant and his friends voluntarily.
Kidnapping in the first degree is defined in Alabama by  13A-6-43(a), Ala.Code 1975, in pertinent part, as follows:
"A person commits the crime of kidnapping in the first degree if he abducts another person with intent to
". . . .
"(4) Inflict physical injury upon him or to violate or abuse him sexually...."
"To abduct," for purposes of kidnapping and related offenses in Alabama, is defined as "[t]o restrain a person with intent to prevent his liberation by either ... [s]ecreting or holding him in a place where he is not likely to be found, or ... [u]sing or threatening to use deadly physical force."  13A-6-40(2). Thus, in order to be abducted, a person must be restrained, which is defined as follows:
"To intentionally or knowingly restrict a person's movements unlawfully and without consent, so as to interfere substantially with his liberty by moving him from one place to another, or by confining him either in the place where the restriction commences or in a place to which he has been moved. Restraint is `without consent' if it is accomplished by:
"a. Physical force, intimidation or deception...."
Therefore, in order to restrain and kidnap a person, it must be without consent; thus, the person's participation is not voluntary. However, it is not necessary that this element exist from the beginning of the course of conduct as long as it is present during the course of conduct. But see  13A-6-43(b), Ala.Code 1975 (addressing the affirmative defense of voluntary safe release.) Such a situation, where the initial consent is withdrawn and the victim becomes an involuntary participant, would be true particularly where the victim, as was the case here, was a hitchhiker. Moreover, where the initial consent is obtained by fraud, such as agreeing to take the hitchhiker to a particular destination with no intent of doing so, then the consent was never lawful. In In the Matter of the Appeal in Maricopa County Juvenile Action No. J-72472-S, 25 Ariz.App. 377, 543 P.2d 806 (1975), two juvenile girls were hitchhiking home when they were picked up by the appellant and an accomplice, who indicated that they would take the girls home. Instead, they took the girls to a park to smoke marijuana. The girls asked not to go to the park, but after *817 threats were made on their life, they pretended to smoke the marijuana and continued to ask to be taken home. While they were at the park, one of the girls was raped. The appellant argued on appeal that he was not guilty of kidnapping because the girls "admittedly initially entered the car voluntarily rather than as a result of force," and "[u]nder appellant's theory, once an initial consent to accompany a person for a particular purpose is established, he may detain the person consenting for whatever time or other purpose he desires." 25 Ariz.App. at 379, 543 P.2d at 808. The Court of Appeals of Arizona did not "believe this to be the law in Arizona or the effect of this particular statute." The court held:
"However, consent procured by fraud is not legal consent.... Furthermore, `"it is not necessary that the involuntariness exist from the beginning of the transaction, if subsequently there is an enforced detention or restraint of liberty."' Ibid. citing People v. Trawick, 78 Cal.App.2d 604, 178 P.2d 45 (1947).
"In State v. Gough, 257 N.C. 348, 126 S.E.2d 118 (1962), annotated at 257 N.C. 348, 126 S.E.2d 118, 95 A.L.R.2d 441, the Court points out:
"`"According to the authorities we have cited, the crime of kidnapping by its very nature cannot ordinarily be committed by an act to which a person, being capable in law of consenting, consents in a legally valid manner. But where false and fraudulent representations or fraud amounting substantially to a coercion of the will of the kidnapped person are used as a substitute for force in effecting kidnapping, there is, in truth and in law, no consent at all on the part of the victim. In brief, under those circumstances the law has long considered fraud and violence as the same in the kidnapping of a person."' 126 S.E.2d at 124.
"The Court there equated fraud with force as an equally condemned manner of carrying out a kidnapping, which it characterized as an unlawful interference with the freedom or personal liberty of the victim, under a statute which merely employed the word `kidnap.' The Court also declared that limiting the kidnapping statute only to forcible takings, as distinguished from fraudulent ones, would be too narrow a construction and would render the statute `useless' in many cases. Appellant's contention here would put every hitchhiker indefinitely at the whim or mercy of the driver offering him a ride, merely because of his original, limited consent. This certainly could not have been the intent of the legislature in enacting  13-491, and such a construction would not make any more sense in Arizona in 1975 than it did in North Carolina in 1962.
"The young victims `consented' to be given a ride to their home; instead, over their objections and pleas, and under threats of death, they were driven to a far distant place, where one of them was raped. Even if the original `taking' was not forcible, and even if we omit consideration of a `fraudulent' initial taking, an unlawful detention (`taking') commenced when the appellant refused to carry out his promise to drive the girls home and instead proceeded further away therefrom against their wills."
Id., 25 Ariz.App. at 379-80, 543 P.2d at 808-09.
Similarly, in People v. Brown, 622 P.2d 109 (Colo.App.1980), the appellant argued that, because the hitchhiker-victim voluntarily entered his truck, the State failed to prove the lack-of-consent element of kidnapping. However, the Court held this claim to be without merit because "it is not *818 necessary to show that involuntariness exists from the beginning of the transaction if subsequently the victim is forcibly detained." Id. at 110, citing People v. Camden, 16 Cal.3d 808, 129 Cal.Rptr. 438, 548 P.2d 1110 (1976). The Court held that because there was testimony indicating that the victim "was restrained from leaving the truck when it turned off the road in a direction contrary to his destination and his efforts to get away once the truck stopped were thwarted," a jury could have inferred "that the initial consent had expired." People v. Brown, supra, at 110-111.
In State v. Barbour, 278 N.C. 449, 180 S.E.2d 115 (1971), a driver offered a hitchhiker a ride, which he accepted, but four miles down the road, the hitchhiker held a knife to the driver's throat. The hitchhiker was subsequently charged with kidnapping, but argued that he was an invitee and that there was no unlawful carrying away by force against the victim's will at the inception of the offense, and that, therefore, a kidnapping did not occur. However, although the Court stated that "[i]t may be conceded that there was no unlawful taking and no unlawful carrying away of [the victim] by force and against his will at the inception and during the first four miles or so or defendant's travel[,]... there was an unlawful taking and carrying away ... from the time defendant held a knife against the throat and chest of [the victim] and, under threat of killing him, commanded and caused him against his will to abandon his own plans and drive the truck as directed by defendant." State v. Barbour, 278 N.C. at 456, 180 S.E.2d at 119.
Moreover, while it is true that an initial consent may be withdrawn during the course of a kidnapping, in the present case, the initial consent was obtained by fraud when the appellant and his accomplices indicated that they would take the victim to Louisiana. Their intent was clearly to return to the Pipeline, where they planned to restrain the victim.
"At commonlaw, kidnapping generally involved forcibly stealing people and shipping them into another country. 3 Blackstone, Commentary on the Laws of England, Book IV, Ch. 15, p. 219 (1769). In the United States the requirement of forcible restraint was expanded to include `some form of enticement or deception.' Note, From Blackstone to Innis: A Judicial Search for a Definition of Kidnapping, 16 Suffolk U.L.R.Ev. 367, 372 n. 27 (1982)."
State v. Amell, 303 Or. 355, 358, 736 P.2d 561, 563 (1987) (wherein the defendant had argued that "once his hitchhiker victim had consented to enter defendant's car and be taken from one place to another, no subsequent action by defendant could turn the incident into a kidnapping"). See also Ervin v. Superior Court, Contra Costa County, 119 Cal.App.3d 78, 173 Cal.Rptr. 208 (1981).
The State presented sufficient evidence in the present case from which the jury could infer that the victim was restrained without her consent and that the appellant was guilty of kidnapping in the first degree.

III.
The appellant argues that the trial court committed reversible error by allowing books and drawings that were characterized as "satanic" into evidence; he argues that this evidence was irrelevant and highly prejudicial to the appellant. In raising this argument, the appellant specifically refers to satanic drawings found in the trunk of his vehicle that were admitted into evidence, testimony from a State's witness that he had been reading from a satanic book at her home, and argument *819 by the prosecutor during the sentencing phase of the trial that the victim's murder had been satanic. The appellant argues that this evidence was irrelevant to the present crime, that it was inadmissible because its probative value was greatly outweighed by its prejudicial effect on the jury, and that it was an impermissible attack on his character.
The record indicates that, before trial, the appellant filed a motion to suppress certain drawings (presumably drawings of a pentagram and devil's head) and a diary kept by the appellant, which were found during the search of the appellant's vehicle. The appellant argued that this evidence was unduly prejudicial, but the State responded that the drawings and the diary were admissible as evidence of motive. The trial court denied the appellant's motion and the drawings and notebook were admitted into evidence. A book found in the appellant's room following the murders entitled Never on a Broomstick, which recounted the history of witches, was also held to be admissible as relevant to prove the appellant's interest in the occult. The testimony the appellant objects to was that of the sister of one his friends, who testified that, shortly after the murder, the appellant was present with her brother and other friends at her home. She testified that, at one point, the appellant walked out to his car and returned with a blue book, from which he began to read. The witness testified that the book was a "satanic book" and testified that she and others were offended by the reading. She testified that the appellant had left a book at her house, which she gave to an investigating officer. This book was admitted into evidence and apparently dealt with the subject matter of witchcraft. The argument by the prosecutor to which the appellant refers occurred during the prosecution's closing argument at the sentencing phase of this trial. During his argument, the prosecutor indicated that this offense was possibly some sort of ritual or offering. The prosecutor's argument was as follows:
"It's true that not everyone convicted of capital murder deserves the death penalty. Capital murder is typically somebody goes into the Quik-Mart, puts a gun in the face of the cashier and gets forty or fifty dollars and the cashier resists somehow and shoots them or kills them, or even worse, kills them to eliminate a witness, or even worse than that, like the Lindbergh kidnapping, takes the baby and when the ransom is not forthcoming then kills the baby. Those are typical capital murder cases. And although there is no good reason, there is in that mind some rational basis. "[The appellant] tells Lila Busby, no, I'm not a satanist and I don't know anything about this case. But he enjoyed everything that he did to Vicki for absolutely no reason other than to perhaps to sacrifice her to Satan. And that's how you know it's especially heinous, atrocious, and cruel, not just that he was indifferent to the suffering, but that he enjoyed it."
This evidence was properly admitted as it was relevant to show motive, and its probative value was not outweighed by the prejudicial effect of this testimony. In Echols v. State, 326 Ark. 917, 936 S.W.2d 509 (1996), the appellant argued that the trial court had erred in allowing evidence of his interest in the occult to be introduced at trial and that the trial judge had abused his discretion in determining that this evidence was relevant and more probative than prejudicial. The appellant argued that the trial court improperly allowed into evidence certain items that had been seized in a prior court proceeding, including a dog's skull, a manual, a funeral register upon which he had drawn a pentagram, *820 had drawn upside down crosses, and had copied certain spells, a heavy metal poster depicting graveyards, and other "trappings of occultism." A State's expert in Echols, supra, had testified that the manner of the killings, as well as the circumstances surrounding the killings, indicated occult activity. The Court held that the evidence was properly admitted as it was relevant to show motive, stating:
"We have said that when the purpose of evidence is to show motive, anything and everything that might have influenced the commission of the act may, as a rule, be shown. The State is entitled to produce evidence showing circumstances which explain the act, show a motive for killing, or illustrate the accused's state of mind. Further, a trial court's ruling on relevancy, as well as prejudicial impact, is afforded great deference by review in court and will not be disturbed absent an abuse of discretion."
326 Ark. at 957, 936 S.W.2d at 528-29. (citations omitted).
In State v. Hayward, 327 Or. 397, 963 P.2d 667 (1998), the appellant argued that the trial court improperly allowed evidence concerning "death-metal music" and satanism to be introduced at the guilt phase of his trial. However, the Oregon Supreme Court held that the evidence was relevant and material as tending to prove the appellant's motives for the offense. The Court noted that one of the theories underlying the charges against the appellant was that satanism and the "death-metal" music "provided at least one of the motives for defendant [and his accomplices] when they planned and committed the Dari-Mart crimes.... The evidence also was relevant to explain the brutality of the attacks on [the victims]...." 327 Or. at 407, 963 P.2d at 674. Although the appellant nonetheless argued that the introduction of this evidence unfairly prejudiced him and was introduced solely to inflame the jury against him, the Court found that the evidence's probative value was not outweighed by the danger of unfair prejudice and that the trial court's decision to allow the evidence was not an abuse of discretion. Id.
In Earnest v. State, 262 Ga. 494, 422 S.E.2d 188 (1992), the appellant argued that the trial court improperly allowed a codefendant to be questioned concerning his involvement in satan worship and church vandalism as this testimony was inadmissible character evidence. The Georgia Supreme Court determined that the evidence was admissible as indicative of a motive for the killing. "Proof of motive is not necessary to prove murder; however, the State may introduce such evidence. `Evidence that is otherwise relevant and material to the issues in a criminal case does not become inadmissible simply because it incidentally puts a defendant's character or reputation into evidence.'" 262 Ga. at 495, 422 S.E.2d at 190 (citations omitted). See also McIntyre v. State, 266 Ga. 7, 11, 463 S.E.2d 476, 481 (1995).
In Oddo v. State, 675 So.2d 58, 62 (Ala. Cr.App.1995), the appellant had argued that the trial court erred in allowing the State to question a defense witness as to whether an individual recently convicted of a similar and highly publicized racially motivated murder was also a member of the White Aryan Resistance, as was the appellant. The appellant argued that the testimony was irrelevant and that it was introduced solely to inflame the jury against him. However, this Court determined that the evidence was properly admitted as relevant, and that its probative value was not outweighed by its prejudicial effect.
"`Evidence is relevant if it has "any tendency to throw light upon the matter in issue, even though such light *821 may be weak and falls short of demonstration." McCain v. State, 46 Ala. App. 627, 247 So.2d 383 (1971); Austin v. State, 434 So.2d 289 (Ala.Cr. App.1983). "Any fact which has causal connection or logical relation to another fact, so as to make the other fact either more or less probable, is competent or relevant." Hurst v. State, 397 So.2d 203 (Ala.Cr.App.), cert. denied, 397 So.2d 208 (Ala.1981); Waters v. State, 357 So.2d 368 (Ala.Cr. App.), cert. denied, 357 So.2d 373 (Ala. 1978).'

"Mitchell v. State, 473 So.2d 591, 594 (Ala.Cr.App.1985). `Evidence ... is relevant and admissible "if it has any probative value, however slight, upon a matter in the case." C. Gamble, McElroy's Alabama Evidence  21.01(1) (4th ed.1991).' Leitner v. State, 631 So.2d 273, 278 (Ala.Cr.App.1993).
"In Jordan v. State, 629 So.2d 738 (Ala.Cr.App.1993), cert. denied, 511 U.S. 1112, 114 S.Ct. 2112, 128 L.Ed.2d 671 (1994), this court held that evidence of an appellant's affiliation with a gang known for criminal activity was probative of motive and that its probative value was not outweighed by its prejudicial effect. Here, the state asserts that the defense witness's testimony was relevant to establish the appellant's association with a white supremacist group. This evidence was correctly received at trial."
675 So.2d at 62.
In the present case, the evidence concerning the appellant's interest in satanism was admissible as relevant to show the motive for this brutal and senseless killing. It was properly introduced as an exception to the rule prohibiting evidence of a defendant's character in order to prove his guilt in the present case. Campbell v. State, 718 So.2d 123, 128 (Ala.Cr. App.1997); Willis v. State, 449 So.2d 1258, 1260 (Ala.Cr.App.1984). Moreover, the probative value of this evidence outweighed its potential prejudicial effects.
"`"`Prejudicial' is used in this phrase to limit the introduction of probative evidence of prior misconduct only when it is unduly and unfairly prejudicial." [Citation omitted.] "Of course, `prejudice, in this context, means more than simply damage to the opponent's cause. A party's case is always damaged by evidence that the facts are contrary to his contention; but that cannot be ground for exclusion. What is meant here is an undue tendency to move the tribunal to decide on an improper basis, commonly, but not always, an emotional one.'"' Averette v. State, [469 So.2d 1371, 1374 (Ala.Cr.App.1985).]"
Robinson v. State, 528 So.2d 343, 347 (Ala. Cr.App.1986) (emphasis in original). See also Campbell v. State, supra, at 128. Thus, in State v. Waterhouse, 513 A.2d 862, 864-65 (Me.1986), the Supreme Court of Maine determined that evidence of satanism and the defendant's belief therein was relevant toward proving his intent as well as being probative of motive. The Court then undertook the balancing of the probative value of this evidence against the danger of its unfair prejudice to the defendant. The Court stated:
"We acknowledge that evidence of defendant's Satanic beliefs carried with it the potential for creating unfair prejudice. Nevertheless, the evidence was relevant and probative on the issues of both motive and intent, and since the challenge to this evidence is based on Rule 403 [M.R.Evid.,] for error at all to exist that probative value must be substantially overbalanced by the danger of unfair prejudice. Weighing these factors, we conclude that the admission of evidence regarding Satanism was not so *822 highly prejudicial, nor did it so taint defendant's trial, as to amount to obvious error."
Id., at 865.
As to the appellant's claims concerning the prosecutorial argument made during the closing argument at sentencing, those comments must be evaluated in the context of the entire trial. Duren v. State, 590 So.2d 360, 364 (Ala.Cr.App.1990), aff'd, 590 So.2d 369 (Ala.1991), cert. denied, 503 U.S. 974, 112 S.Ct. 1594, 118 L.Ed.2d 310 (1992). Moreover, such arguments are to be viewed as delivered in the heat of debate and it should be assumed that such statement are valued by the jury at their true worth and are not expected to "become factors in the formation of the verdict." Bankhead v. State, 585 So.2d 97, 106 (Ala.Cr.App.1989), remanded on other grounds, 585 So.2d 112, 127 (Ala.1991), aff'd, 625 So.2d 1141 (Ala.Cr.App.1992).
A review of the record in the present case, including the specific details of the torture of the victim and the brutality of the killing, clearly demonstrates that the evidence concerning satanism did not have an undue tendency to move the jury to convict the appellant on an improper basis. There was no error as to admission of this evidence.

IV.
The appellant argues that the trial court committed reversible error by refusing to supply defense counsel with copies of the transcripts from the trials of his codefendants. The record indicates that before any accomplices in this case were tried, the trial court held a hearing to discuss various motions filed by several of the accomplices. During the discussion between the trial court and the appellant's defense counsel concerning the status of certain of his motions, the following transpired:
"[DEFENSE COUNSEL]: ... I filed a motion last week for trial transcripts. There are four defendants charged in this case. We're the fourth to be charged, and we would anticipate thatÔÇö I mean the fourth one to be triedÔÇö certain exculpatory information coming out in the first three trials. And we would like to have transcripts of those trials prior to going to trial on our case. I had spoken to Your Honor a couple of weeks ago, and you mentioned that we would try and work something out with some tapes or something. We would prefer some way to be able to have typed transcripts of those portions of the case that may be exculpatory as to Mr. Grayson. Now how that can be achieved, I'm not sure. Because we're talking about a very short time frame in trying these four cases. And it wouldÔÇö the testimony is the only thing we're after. You know, we're not after the voir dire and the openings and closings or anything like that. The only thing we're after is the actual testimony.
"And we feel like thatÔÇö
"THE COURT: Well, the court, of course, would have to know that testimony you were talking about at the time.
"[DEFENSE COUNSEL]: At this time I don't know. We would anticipateÔÇö we're not in a position to be able to tell you today exactly what we're going to want until we're able to view what the witnesses said.
"THE COURT: Well, that would be the appropriate time to ask, wouldn't it?
"[DEFENSE COUNSEL]: Well, Judge, if we don't have a transcript, we're not going to know by the time we try our case what witnesses said. I mean we're notÔÇöthe State will not pay us to sit down here and listen and monitor the cases. And the only way we're *823 going to be able to review what a particular witness has said is by way of a transcript. And we would like to be able to do that prior to trying our case.
"THE COURT: Well, the Court, of course, is not going to order a carte blanche transcription of all the testimony in each case that we tried before yours.
"[DEFENSE COUNSEL]: That's what this motion is seeking, is to be able to have a copy of the transcript for us to determine what information, if any, [is] exculpable and what we need in order to obtain a fair trial for Mr. Grayson.
"THE COURT: Well, I'm going to deny that request. If you have a specific request in regard to particular testimony, then I'll consider that.
"[DEFENSE COUNSEL]: Judge, it's absolutely impossible for me today to tell you what testimony I'm going to need. Because I don't know what all is going to come out in the first three cases. And I don't know how I'm going to be able to provide you that information without either sitting down here listening to the tapes for each trial or obtaining the transcript.
"In viewing this morning Mr. Duncan, who is the first case to be tried, there are probably two dozen witnesses that are listed as potential witnesses. Now they may or may not all testify. But of those witnesses, I have no earthly idea at this point in time which may give exculpatory information. And I don't know of a way I'm going to be able to provide Your Honor with those specifics prior to trial. That's the whole purpose we're trying to obtain the transcripts.
"THE COURT: Well, if you're asking the Court to order all the testimony during the trials before your case is tried, then I'm going to deny that motion."
Thus, the record indicates that the appellant made his request prior to the existence of any transcripts. Moreover, defense counsel indicated that the trial court had "mentioned that we would try and work something out with some tapes or something." However, defense counsel stated that they wanted typed transcripts of the three other trials.
On appeal, the appellant cites the United States Supreme Court's decision in Britt v. North Carolina, 404 U.S. 226, 92 S.Ct. 431, 30 L.Ed.2d 400 (1971), to support his argument that he was entitled to these transcripts.
"The United States Supreme Court in Britt v. North Carolina, 404 U.S. 226, 92 S.Ct. 431, 30 L.Ed.2d 400 (1971), ruled that a state must provide an indigent defendant with a transcript of his earlier trial if a transcript is needed for an effective defense. The Britt court recognized that whether the request for a free transcript should be granted depends on two factors: (1) the value of the transcript to the defendant and (2) the availability of alternative means which would fulfill the same function as a transcript. The Court indicated that, as to the first factor, the defendant need not show that a transcript of his earlier trial would be valuable to him:
"`... Our cases have consistently recognized the value to a defendant of a transcript of prior proceedings, without requiring a showing of need tailored to the facts of the particular case.... [E]ven in the absence of specific allegations it can ordinarily be assumed that a transcript of a prior mistrial would be valuable to the defendant in at least two ways: as a discovery device in preparation for trial, and as a tool at the trial itself for the impeachment of prosecution witnesses.' (Emphasis added, footnote *824 omitted.) 404 U.S. 228, 92 S.Ct. 434, 30 L.Ed.2d 404."
People v. Brown, 126 Mich.App. 763, 765-66, 337 N.W.2d 915, 916-17 (1983). However, the Michigan court in People v. Brown determined that the holding in Britt v. North Carolina, supra, did not apply to the case before it because the circumstances were factually distinguishable. The Brown court stated:
"This case, however, is distinguishable from Britt in a critical respect. In Britt, the defendant requested a transcript of his own earlier trial. In this case, the defendant asked for a copy of the transcript of her codefendant's trial. A situation similar to the one we confront in the instant case, however, was presented to this Court in People v. Kelley, 49 Mich.App. 720, 212 N.W.2d 750 (1973). In Kelley, three men, Clark, Hall and Kuykendall, were convicted of the murder of David Lipton. At the trial, several witnesses testified, including Sue Valentine who saw the assailants seconds before the murder. Subsequently, the convictions were vacated on the prosecutor's motion and the murder investigation was reopened. Five persons, including the defendant, were then charged with the murder. The defendant was tried separately from the other four and after the people had secured their convictions. Prior to his trial, the defendant moved for the production of the transcript of the trial of the original three suspects. Only the testimony of Sue Valentine was produced. The defendant was later convicted of the murder. On appeal, the defendant argued that the failure to produce the entire transcript was error. This Court disagreed, reasoning as follows:
"`[W]e perceive the prior testimony sought, but not produced, did not establish crimination of defendant, but only the corpus delicti of the incident, an issue which defense counsel practically conceded at the outset of trial. Moreover, the testimony defendant sought to be produced did not even criminate Clark, Hall, or Kuykendall. Of those who testified in both trials, only Sue Valentine's testimony tended to establish the guilt of any particular person. Thorough examination of the record reveals defense counsel was well versed in the details of the evidence produced in the prior trial, and we are not satisfied that transcription of the testimony there adduced was the only means for obtaining that information.
"`. . . .
"`[W]e decline to rule that production of prior testimony establishing a rather mundane corpus delicti of the same crime in another case against another defendant is necessary in order to prove a subsequent defendant with a fair trial.'
"In effect, the Kelley Court, which examined the value that the transcript would have to the defendant, abandoned Britt's presumption that a requested transcript would be valuable to the defendant. Kelley seems to require a particularized showing of need where a defendant requests a transcript of a proceeding held in a case to which he was not a party.
"The present case is distinguishable from Kelley. Here, the defendant requested a transcript of the trial of her codefendant. Clark, Hall and Kuykendall, however, were not Kelley's codefendants, even though they were charged with the same crime. Nevertheless, courts in other jurisdictions have required a showing of particularized need where a defendant requests a transcript of a proceeding involving a *825 codefendant.2 The position taken by the Court in State v. Razinha, 123 Ariz. 355, 358, 599 P.2d 808, 811 (App.Ct.1979), is typical:
"`We do not believe a contention that the transcript of the trial of a third person is needed before an effective defense can be rejected out of hand merely by saying that no case has so held. Instead, the two-pronged test of necessity set forth in Britt must be applied to the facts. However, the first prong of the test, the value to the defendant, cannot be assumed as it was in Britt. There must be a showing of specific need. A mere showing that the prior trial was that of a codefendant is not sufficient. [Citations omitted.] The reason for distinguishing between the Britt situation, a prior mistrial, and a situation analogous to the one here, a trial of a co-defendant, is that the witnesses may not be common. Even if they are, their testimony as to the co-defendant may differ greatly from their proposed testimony concerning the defendant's part in the crime, depending upon the circumstances of each case.'
"We agree and hold that where a defendant requested that the state provide him with a free transcript of the separate trial of a codefendant, the defendant must show that that transcript will be valuable to him.
"In the present case, defendant did not show in the trial court and does not show on appeal how the transcript of the Audison trial would have assisted in trial preparation or impeaching witnesses. Therefore, we hold that the trial court did not err in denying defendant's motion for the production of portions of the Audison trial transcript.
"2 See e.g., State v. Coe, 223 Kan. 153, 574 P.2d 929 (1977); State v. Peterson, 46 Ohio St.2d 425, 349 N.E.2d 308 (1976); State v. Cox, 101 N.J.Super. 470, 244 A.2d 693 (1968); State v. McAllister, 287 N.C. 178, 214 S.E.2d 75 (1975); State v. Tison, 129 Ariz. 526, 633 P.2d 335 (1981); cert. den. 459 U.S. 882, 103 S.Ct. 180, 74 L.Ed.2d 147 (1982), reh. den. 459 U.S. 1024, 103 S.Ct. 391, 74 L.Ed.2d 520 (1982)."
126 Mich.App. at 766-69, 337 N.W.2d at 917-18. Thus, where a defendant requested a transcript of a proceeding involving a codefendant, to which he was not a party, a number of jurisdictions have required a showing of particularized need. See People v. Russell, 7 Ill.App. 3d 850, 289 N.E.2d 106 (1972) (holding that a defendant was entitled to a transcript of the trial of codefendants who were tried together and convicted, where one of the convictions was reversed on the ground of reasonable doubt).
Similarly, in State v. Tison, 129 Ariz. 526, 633 P.2d 335 (1981), the appellant claimed that the trial court erred by denying his request for transcripts of an accomplice's trial conducted immediately prior to the appellant's trial, where the accomplice had been charged with the same substantive charges made against the appellant. The Supreme Court of Arizona distinguished that case from Britt v. North Carolina, supra, stating that, because the indigent defendant was requesting a transcript of a codefendant's trial, he should have shown a specific need. Moreover, the Court in State v. Tison noted the Britt Court's decision to affirm the lower court's judgment although the defendant did not receive the transcripts, was based on the availability of an alternative substantially equivalent to a transcript, and found that the evidence in its case indicated that the transcript was not available to anyone because no transcript had been prepared before the appellant's trial. The Supreme Court of Arizona held as follows:

*826 "The United States Supreme Court in Britt v. North Carolina, 404 U.S. 226, 92 S.Ct. 431, 30 L.Ed.2d 400 (1971), held that an indigent defendant must be provided with transcripts of a prior trial that ended in a mistrial without showing a specific need. The necessity of the transcripts to an effective defense was to be presumed. But in an analogous situation, the Court through Justice Rehnquist said:
"`... [T]he fact that a particular service might be of benefit to an indigent defendant does not mean that the service is constitutionally required. The duty of the State under our cases is not to duplicate the legal arsenal that may be privately retained by a criminal defendant in a continuing effort to reverse his conviction, but only to assure the indigent defendant an adequate opportunity to present his claims fairly in the context of the State's appellate process.' Ross v. Moffitt, 417 U.S. 600, 616, 94 S.Ct. 2437, 2447, 41 L.Ed.2d 341 (1974).'
"Hence, when the indigent defendant requests a transcript of a co-defendant's trial, its necessity to an effective defense is not presumed. Rather, a defendant must show specific need. State v. Razinha, 123 Ariz. 355, 359, 599 P.2d 808 (App.Ct.1979). In distinguishing Britt, the court in State v. Razinha said:
"`The reason for distinguishing between the Britt situation, a prior mistrial, and a situation analogous to the one here, a trial of a co-defendant, is that the witnesses may not be common. Even if they are, their testimony as to the co-defendant may differ greatly from their proposed testimony concerning the defendant's part in the crime, depending upon the circumstances of each case.' 123 Ariz. at 358, 599 P.2d 808.
"While the witnesses were the same in Greenawalt's and appellant's trials, there must still be a showing of specific need. No such need was established. Appellant did not and does not on appeal elaborate on how the transcripts would have assisted in either trial preparation or impeaching witnesses.
"More important, as stated in State v. Littles, 123 Ariz. 427, 429, 600 P.2d 40 (App.1979):
"`Britt does not stand for the proposition that an indigent defendant is absolutely entitled to a transcript of the prior proceedings under all circumstances. It is only where the transcript is available to others for a price that the principles of Britt apply. Here, the transcript was not available to anyone. We do not believe that under the circumstances the trial court was required to delay the trial some unknown time in the future in order to secure the transcript.'
"Randy Greenawalt's trial was completed on February 16, 1979. Appellant's trial commenced February 20, 1979 and ended February 27. It appears the transcripts of Geenawalt's trial were not prepared and available until May 4, 1979. The transcripts not being available to others, they were not required to be provided to appellant."
State v. Tison, 129 Ariz. at 540-41, 633 P.2d at 349-50.
In the present case, the appellant's trial began on January 29, 1996; he had made his request for the transcripts on October 16, 1995. This Court's records indicate that the transcripts of the appellant's accomplices were completed and submitted to this Court on the following dates: Trace Duncan on October 23, 1996; Kenny Loggins on January 13, 1997; and Louis Mangione on November 20, 1996. Thus, the records the appellant sought were not *827 available for at least a year following his request.
In Alabama, this Court has previously declined to apply Britt v. North Carolina, supra, beyond the circumstances wherein an indigent requested a copy of the transcript of his prior proceedings where the transcript was shown to be valuable to the defense and a functional alternative existed. In McKinney v. State, 665 So.2d 209 (Ala.Cr.App.1995), the appellant, a juvenile being prosecuted as an adult, had requested funds to secure a transcript of his juvenile transfer hearing. This Court found no error in the trial court's denial of the appellant's request because the record indicated that the appellant had access to, yet had failed to take advantage of, alternatives to the requested transcript. Moreover, the Court noted that there was no indication that the prior proceedings were transcribed, because Rule 20(A), Ala. R.Juv.P., does not require a court reporter at these proceedings. In arriving at this decision, this Court stated:
"Although Britt provides that the value to the defense of a transcript of prior proceedings may usually be presumed, this court has not extended the rationale of Britt so far as to recognize the value that a transcript of proceedings in juvenile court may have in every case where a defendant is transferred to the circuit court for trial as an adult. A juvenile transfer hearing is in the nature of a preliminary hearing. O.M. v. State, 595 So.2d 514, 517 (Ala.Cr.App.1991), cert. quashed, 595 So.2d 528 (Ala.1992). This court has held `[a]n indigent defendant is not entitled to a free transcript of the testimony taken at his preliminary hearing.' Leonard v. State, 369 So.2d 873, 875 (Ala.Cr.App.), cert. denied, 369 So.2d 877 (Ala.1979)."
665 So.2d at 211.
Similarly, in the instant case, there was no error in the trial court's failure to apply Britt v. North Carolina to a situation where a defendant is seeking to obtain the transcripts of the trials of his codefendants. If these transcripts were to contain exculpatory information, then the appellant would certainly be entitled to that information under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). There is no indication on appeal, however, that these transcripts contained any exculpatory information. Moreover, the trial court suggested that the appellant could have used tapes of these proceedings as an alternative. The appellant has made no showing of any particularized need for these transcripts, and as they were not completed prior to the appellant's trial, they were not available to either party at any price. For these reasons, there was no error by the trial court in denying the appellant's motion.

V.
The appellant argues that the trial court committed reversible error by failing to suppress the evidence seized as a result of a search of his car, because, he says, the search was conducted without proper authority or jurisdiction. Specifically, the appellant argues that, because the car was located in St. Clair County when it was searched, and the district court judge who signed the search warrant was in Jefferson County, that judge was without jurisdiction to issue the search warrant. Moreover, the appellant argues that the trial court improperly concluded that he did not have the standing to challenge the search.
The record indicates that the appellant filed a pretrial motion to suppress all of the evidence found during the search "of a car alleged to have been owned or operated by [him]." A hearing was held on this issue. At the hearing, the State presented the testimony of an officer with the St. *828 Clair Sheriff's Office who was investigating this murder. The officer testified that during the course of the investigation the St. Clair Sheriffs Office had learned that the appellant owned a vehicle matching a certain description it had been given. Thereafter, an individual telephoned the officer and told him where the vehicle was located; it was in St. Clair County. The officer testified that, through information from one of the appellant's accomplices, he learned that the vehicle had been involved in the murder. The officer then stated that he obtained a search warrant from a judge in Jefferson County, after presenting him with the pertinent information. The officer testified that the vehicle was being stored at the St. Clair County impound lot and that, before the search, it was brought to Jefferson County to be searched.
On cross-examination, the officer further testified that the individual who had telephoned concerning the vehicle had told him that he had picked up the vehicle from the appellant's apartment complex and had driven the vehicle to his residence and was keeping it there, at the request of the appellant. The individual stated that the appellant had indicated that he was concerned that someone would damage the vehicle at the apartment complex and that he therefore asked the individual to keep the vehicle at his home. The officer testified that that individual gave the St. Clair County Sheriff's Office permission to pick the vehicle up and to take it to their impound lot. The officer testified that a title search on the vehicle and the vehicle's registration indicated an owner who the officer testified he believed was related to the individual who had telephoned concerning the vehicle's whereabouts. The officer testified that he obtained the warrant in Jefferson County and transported the vehicle to be searched to Jefferson County so that it could be processed closer to the forensic science laboratory, which he considered to have been a better location for the search. The officer testified that "the team" from forensic sciences took possession of some of the evidence obtained from the vehicle and that the officer secured some of the paperwork and certain evidence obtained from the trunk.
Following the testimony of this witness, defense counsel moved to suppress the evidence obtained from the search because, he argued, the judge did not have the authority to authorize a search warrant to be executed in another county, and the officer was aware that the vehicle was located in a county other than the county of the issuing judge. The trial court then asked if the appellant had standing to make this complaint. The Court further noted that the search warrant gives the location of the vehicle as Jefferson County at the time that it was searched. He stated that "[t]hat was the authority given to the officers at the time." The prosecutor then pointed out that the judge had been informed that, although the vehicle was being stored in St. Clair County, it was going to be moved to Jefferson County for processing in order to be closer to the Department of Forensic Sciences. Thereafter, the trial court denied the motion.
The appellant cites Rule 3.7, Ala. R.Crim.P., which requires that in issuing a search warrant, a district judge must have jurisdiction in the county where the property to be searched is located. In the present case, the record indicates that the vehicle to be searched was located in a different county than the one over which the issuing magistrate had jurisdiction; both the officer and issuing magistrate were aware of this fact. Therefore, in the present case, whether the good-faith exception to the Fourth Amendment exclusionary *829 rule pertains, as the State argues in its brief, is questionable. "The good faith exception provides that when officers acting, in good faith, that is, in objectively reasonable reliance on a warrant issued by a neutral common detached magistrate, conduct a search and the warrant is found to be invalid, the evidence need not be excluded. United States v. Leon, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984)." Rivers v. State, 695 So.2d 260 (Ala.Cr.App.1997) (officers' search of a Mobile County residence pursuant to a warrant issued by a Washington County court was held to have been conducted in good faith because: the officers had sufficient probable cause; the search was terminated after the officers discovered that the house was in Mobile County; the officers sought a search warrant from a Mobile County court before continuing the search; and officers from Washington County were also executing the warrant, "indicating that they believed the residence was in Washington County; ... the house was apparently located near the county line." Id., at 262.) See also Garrett v. State, 739 So.2d 49 (Ala.Civ.App.1999) (a Jefferson County judge issued a search warrant for property located in Jefferson County; however, part of the property was in Blount County; the court, rather than making a factual determination as to which county was the venue of the search, held that the search was valid because the officers had made a good-faith effort to comply with the warrant requirement). See State v. Zemunski, 228 Neb. 536, 423 N.W.2d 443 (1988) (the court found that, because the officer had a vehicle towed from one county to another where the issuing judge presided and the search ensued, the search could not be subject to the good-faith exception as the officers acted knowingly as opposed to a situation where they might in good faith execute an invalid warrant).
In the present case, even if the search warrant was invalid and the good-faith exception not applicable under the present circumstances, the search and seizure were proper because they were undertaken pursuant to a valid consent. Because the consent "was both voluntary and not an exploitation of the prior [possible] illegality," the search pursuant to the consent was valid. 3 W. LaFave, Search and Seizure,  8.2(d)(2d ed.1987) at p. 190 (emphasis in original.) The police were given the consent to take the vehicle and to process it by a third party, who was a friend of the appellant and who had taken possession of the vehicle from the appellant at the appellant's instruction. The third party testified at trial that, when the appellant telephoned him and asked him to take the vehicle to his home, he already had a key to the car in his possession. The witness further testified that he had often used the vehicle and that he had been given power of attorney over the vehicle in order to change the title. He testified that, when following the appellant's instructions, he located the vehicle, it had slashed tires, so the third party put new tires on the vehicle and took it home. While it was there, he drove it several times "because it hadn't been ridden in a while." The witness testified that, when he learned that the appellant was being sought in connection with a murder, he telephoned the police and told them about the vehicle and asked them to retrieve the vehicle. He testified at that time that he had had the vehicle for approximately a month. The appellant offered no evidence to indicate why this third party did not have the authority to consent to the search of the vehicle. In Zumbado v. State, 615 So.2d 1223, 1239 (Ala.Cr.App.1993), the appellant claimed that certain property was improperly seized as a result of a search of his automobile, although his girlfriend had *830 consented to the search of the car. The Court found that, because the third party had lived with the appellant for a number of years and the appellant had been arrested on the day of the search, the third party at the time of the search was "apparently in exclusive control of the premises at which the car was parked." This Court applied the reasoning in Johnson v. State, 584 So.2d 881 (Ala.Cr.App.1991), which addressed a similar situation, as follows:
"`[Section] 334.01(3)(b) of McElroy's Alabama Evidence, states that the general rule is as follows:
"`"... A defendant has no constitutionally protected right of privacy where he does not have exclusive possession and control over the place searched. The person who does have present, exclusive possession and control over the place in question, or who shares the premises coequally with the person claiming to be aggrieved, may give consent to search."
"`C. Gamble, McElroy's Alabama Evidence,  334.01(3)(b)(3rd ed.1977); See also, Myrick v. State, 45 Ala.App. 162, 227 So.2d 448, 450 (1969) (upheld a search consented to by defendant's father to whom defendant had given the keys to his car); and Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) (upheld consent given by occupant of car who indicated that the car belonged to his brother).
"`The evidence indicates that Mr. Adkins was in sole possession and control of the vehicle and that he voluntarily consented to the search. The appellant offered no evidence tending to show that Mr. Adkins did not have the authority to consent to the search. The evidence found as a result of the search was therefore properly admitted. See also Illinois v. Rodriguez, 497 U.S. 177, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990) (reasonable belief of police officer that third party giving consent to search had common control over area searched makes search reasonable notwithstanding fact that third party did not in fact have such control).'

"Johnson v. State, 584 So.2d 881, 886 (Ala.Cr.App.1991)."
Zumbado v. State, supra, at 1239-40.
In Johnson v. State, 584 So.2d 881, 885 (Ala.Cr.App.1991), the police obtained information that the defendant was involved in a murder and that his car may have been used in the crime. They then learned that the appellant was living in Georgia with his mother-in-law. They traveled to Georgia, where they saw the car being driven up to the house by a third party, not related to the appellant. However, the third party "was in sole physical possession of the car." Id., at 885. The officer asked the third party about examining the car, and he voluntarily consented to the search. Moreover, he indicated through a permission to search form that the vehicle was under his care, custody, and control. This Court held that his consent was valid. See also Ex parte Payne, 683 So.2d 458, 473-74 (Ala.1996) (search of the appellant's vehicle after towing it to the sheriff's department was proper, because his sister had previously consented to the search; her consent was valid because the appellant had left his vehicle parked on property rented by his sister with the windows rolled down and the keys in the ignition, so that he did not have exclusive control over the automobile when it was searched; moreover, the Alabama Supreme Court concluded that the appellant's sister had apparent exclusive control over the property, including the automobile).
Therefore, because there was a valid consent to the search of the automobile in *831 the present case, any impropriety in the search warrant was harmless error.

VI.
The appellant argues that the trial court committed reversible error by failing to suppress his statement; he alleges the statement was involuntary because he did not knowingly and intelligently waive his Miranda rights. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Specifically, the appellant alleges that his statement was involuntary. He says that he was approached by the investigating officers while he was incarcerated on unrelated charges and was questioned at 4:00 a.m., after being told that his codefendants had made statements to the authorities indicating that he had been the "ring leader" in the murder. The appellant also argues that his waiver of his Miranda rights was ineffective because, he says, it was not knowingly and intelligently entered; he says the investigating officer merely testified that the appellant "indicated that he understood the waiver" without testifying as to how the appellant had indicated this understanding and also testified that the appellant "appeared to understand the rights" without testifying as to the basis for this belief.
However, the record indicates that, during the investigation, the appellant was in the Jefferson County Jail. He was brought down to an interview room where three officers were waiting. There was testimony that the appellant was advised that the officers wanted to speak to him pertaining to the murder in St. Clair County and the appellant agreed to talk to them. He was then read his Miranda rights. Agent Flippo, of the Alabama Bureau of Investigation, testified that "he stated he understood" these rights and that he signed the warnings. Agent Flippo was subsequently asked if the appellant indicated that he understood his rights; he answered affirmatively. Agent Flippo was also asked if the appellant indicated that he wished to have an attorney present before speaking to the officers, and the officer indicated that he did not. Agent Flippo was asked if the appellant indicated that he wished to remain silent, to which Agent Flippo answered, "No." He was subsequently asked, "Did he [the appellant] indicate that he understood the waiver portion of the form?" Agent Flippo responded that he did. He testified that neither he nor anyone in his presence indicated that things would be better for the appellant if he cooperated and that neither he nor anyone in his presence threatened the appellant in any way before he signed the form or spoke to them. He was then asked, "Did he appear to understand the rights that you explained to him?" Agent Flippo responded affirmatively and testified that the appellant had spoken voluntarily.
Another of the officers who was present during the questioning, Investigator Joe Sweatt of the St. Clair County Sheriff's Department, testified that Agent Flippo advised the appellant of his Miranda rights while in his presence. Investigator Sweatt testified that Agent Flippo asked the appellant if he understood all of his rights and the appellant "responded with yes." He further testified that the waiver section of the form was also read to the appellant by Agent Flippo and that the appellant signed the waiver. Investigator Sweatt further testified that the appellant did not appear groggy, but rather appeared to be alert and awake and that he did not seem to be under the influence of any medication.
After the appellant waived his rights, he apparently made a statement indicating that his accomplices were not going to *832 "hang this thing on me." He was left alone, and made a handwritten statement.
The State provided sufficient evidence that the appellant's waiver of his Miranda rights was undertaken knowingly. The appellant appears to take issue with the term "indicated" as it was used in relation to the appellant's affirmation of his understanding. However, this term was included in the questions posed by the prosecutor, rather than in the officer's responses. Moreover, as long as there is sufficient supporting testimony, there is no impropriety in the use of such a term. See, e.g., Drinkard v. State, 777 So.2d 225 (Ala.Cr.App.1998) (use of "indicated" concerning the appellant's knowingly waiving his rights to a sentencing hearing before a jury); Abernathy v. State, 642 So.2d 519, 521 (Ala.Cr.App.1994) (where appellant alleges that his statement was improperly admitted because his mental condition rendered him incapable of waiving his Miranda rights, the Court found no impropriety as "the evidence is unrefuted that [the officer] read the appellant his Miranda rights and that the appellant indicated that he understood those rights and signed a waiver"). Pardue v. State, 661 So.2d 263, 266 (Ala.Cr.App.1993) ("The unrefuted evidence shows that the officers read a waiver of rights form to the appellant, that the appellant indicated that he understood his rights and the contents of the waiver form, and that the appellant signed the waiver of rights before he gave his statement.").
As to the claims by the appellant that his statement was involuntary, he bases these allegations on the fact that the officers approached him at approximately 4:00 a.m. or 5:00 a.m. and that he had allegedly taken medication to help him sleep. Although the appellant claims that his being interrogated between 4:00 a.m. and 5:00 a.m. caused his statement to be involuntary, such alleged fatigue is only a factor to be considered by the jury in determining whether it finds a statement to be involuntary. In Jackson v. State, 674 So.2d 1318, 1326-28 (Ala.Cr.App.1993), aff'd in pertinent part, reversed in part, 674 So.2d 1365 (Ala.1994), on return to remand, 674 So.2d 1370 (Ala.Cr.App.1995), the appellant claimed that his statement was involuntary because "he had not slept since the previous night, and the officers continued to interrogate him, despite what he describes as his state of sleep deprivation." Id., at 1327. In Jackson, this Court stated that the record did indicate that there was testimony from investigating officers that the appellant appeared "sleepy or fatigued," and the appellant had stated, during his questioning, that he was tired; however, there was no indication that the appellant ever requested that the questioning cease because of his condition. At the close of the appellant's statement in Jackson, the record indicated that the officers asked if they had "hurt him in any way," and the appellant responded, "`Yes, y'all not letting me go to sleep, man. I'm tired, man. I was up all f____ night....'" Id., at 1327. In holding that this condition of sleepiness or fatigue constituted but one factor to be considered by the jury, this Court stated:
"This claim is also to be considered by the jury in determining the credibility and weight to accord the statement under the totality of the circumstances. This court has found that where a defendant alleged that his statement was involuntary because, among other reasons, he was deprived of food and drink and `was in poor condition physically due to lack of sleep and the consumption of alcohol and drugs,' this court found that upon a consideration of the totality of the circumstances, he appellant's statement was voluntary. Callahan v. State, *833 557 So.2d 1292, 1298-99 (Ala.Cr.App.), affirmed, 557 So.2d 1311 (Ala.1989). Furthermore, the Alabama Supreme Court refused to accept as a `coercive factor' the fact that a juvenile defendant was not questioned until a late hour. Ex parte Smith, 611 So.2d 1023 (Ala. 1992). In Whittle v. State, 518 So.2d 793, 796 (Ala.Cr.App.1987), the defendant argued that his confession was inadmissible because earlier on the day that he gave his statement he had taken a number of sleeping pills and had been drinking heavily. This court applied the principles set out in Williams v. State, 461 So.2d 834 (Ala.Cr.App.1983), reversed on other grounds, 461 So.2d 852 (Ala.1984), and in Musgrove v. State, 519 So.2d 565 (Ala.Cr.App.), affirmed, 519 So.2d 586 (Ala.1986), to determine whether the appellant's confession had been properly admitted. These principles are set out as follows:
"`"`(1) The test for voluntariness, involves a consideration of the totality of the circumstances. Haynes v. Washington, 373 U.S. 503, 513-14, 83 S.Ct. 1336, 1342-43, 10 L.Ed.2d 513 (1963). (2) "The admissibility of confessions is for the court, their credibility is for the jury." Phillips v. State, 248 Ala. 510, 520, 28 So.2d 542 (1946). (3) Where the voluntariness inquiry presents conflicting evidence and the trial judge finds that the confession was voluntarily made, great weight must be given his judgment. "(W)here there is a genuine conflict of evidence great reliance must be placed upon the finder of fact." Blackburn v. Alabama, 361 U.S. 199, 208, 80 S.Ct. 274, 281, 4 L.Ed.2d 242 (1960). (4) This finding will not be disturbed on appeal unless the appellate court is convinced that the conclusion is palpably contrary to the great weight of the evidence and manifestly wrong. Harris v. State, 280 Ala. 468, 470-71, 195 So.2d 521 (1967). (5) Even where there is credible testimony to the contrary, if the evidence is fairly capable of supporting the inference that the rules of freedom and voluntariness were observed, the ruling of the trial court need only be supported by substantial evidence and not to a moral certainty. Thompson v. State, 347 So.2d 1371, 1375 (Ala.Cr. App.), cert. denied, 347 So.2d 1377 (Ala.1977), and cases cited therein. "Review of the court's action is limited to determining whether its finding was clearly erroneous." United States v. Greer, 566 F.2d 472, 473 (5th Cir.1978).'"'

"Whittle v. State, 518 So.2d at 796, quoting Musgrove v. State, 519 So.2d at 576."
Jackson v. State, supra, at 1327. See also Russell v. State, 739 So.2d 58 (Ala.Cr.App. 1999) ("There was no evidence whatsoever regarding the affects of the late hour on [defendant's] free will to give a statement. There was no evidence suggesting that [defendant] was fatigued, that his will was overborne, or that he was sleepy at the time of the interrogation.").
Similarly, in Burgess v. State, 811 So.2d 557 (Ala.Cr.App.1998), the appellant argued that his statement was involuntary because he was "physically exhausted and under emotional strain at the time of the interrogation." He argued that he had been arrested in the middle of the night and taken from his home to the police station without being allowed to fully dress. In holding that the possibility of physical exhaustion and emotional strain on a defendant when giving a statement is but one factor to be considered in determining the credibility and weight to be afforded to the statement, this Court noted that "[t]here was no testimony from the interrogating officers that Burgess appeared *834 to be exhausted or emotionally distressed to the point of being unable to voluntarily waive his rights and give a statement." Id., at 587. Similarly, in the present case, there was no evidence other than the appellant's argument that he was groggy because he was awakened at an early hour, to support this claim. The officers testified that the appellant appeared to be alert and coherent.
Moreover, the appellant's claim that his statement was involuntary because he had taken sleeping pills given to him by medical personnel at the hospital before giving his statement, is only a factor to be considered in determining the weight and credibility, because there is no indication that the appellant was intoxicated to the point of mania. In Whittle v. State, 518 So.2d 793, 796 (Ala.Cr.App.1987), the appellant alleged that his statement was involuntary because he had been drinking heavily on the day of the offense and had taken "a number of nerve pills or sleeping pills after the incident and did not remember giving any statements after his arrest...." Id. The appellant in Whittle was arrested at approximately 4:00 a.m. and gave his first statement at 4:45 a.m. and a subsequent statement at 9:45 a.m. Despite the appellant's claim and arguments concerning the circumstances of his statement, this Court concluded that the State provided sufficient evidence that the statement was voluntary based on the testimony of several officers, as did this Court in Musgrove v. State, 519 So.2d 565 (Ala. Cr.App.1986). In Whittle, an officer testified that, although he could smell alcohol on the appellant, "`[h]e was very capable of moving around when he wanted to and he could talk with a good level head. He made complete sentences and he didn't stammer or talk thick-tongued.'" Id. This Court then quoted Musgrove v. State, as follows:
"`"(1) The test for voluntariness involves a consideration of the totality of the circumstances. Haynes v. Washington, 373 U.S. 503, 513-14, 83 S.Ct. 1336, 1342-43, 10 L.Ed.2d 513 (1963). (2) `The admissibility of confessions is for the court, their credibility is for the jury.' Phillips v. State, 248 Ala. 510, 520, 28 So.2d 542 (1946). (3) Where the voluntariness inquiry presents conflicting evidence and the trial judge finds that the confession was voluntarily made, great weight must be given his judgment. `(W)here there is a genuine conflict of evidence great reliance must be placed upon the finder of fact.' Blackburn v. Alabama, 361 U.S. 199, 208, 80 S.Ct. 274, 281, 4 L.Ed.2d 242 (1960). (4) This finding will not be disturbed on appeal unless the appellate court is convinced that the conclusion is palpably contrary to the great weight of the evidence and manifestly wrong. Harris v. State, 280 Ala. 468, 470-71, 195 So.2d 521 (1967). (5) Even where there is credible testimony to the contrary, if the evidence is fairly capable of supporting the inference that the rules of freedom and voluntariness were observed, the ruling of the trial court need only be supported by substantial evidence and not to a moral certainty. Thompson v. State, 347 So.2d 1371, 1375 (Ala.Cr.App.), cert. denied, 347 So.2d 1377 (Ala.1977), and cases cited therein. `Review of the court's actions is limited to determining whether its finding was clearly erroneous.' United States v. Greer, 566 F.2d 472, 473 (5th Cir. 1978)."'"
Whittle v. State, 518 So.2d at 796.
In Jackson v. State, 674 So.2d 1318, 1326 (Ala.Cr.App.1993), aff'd in pertinent part, 674 So.2d 1365 (Ala.1994), the appellant argued that he was intoxicated when his statement was given and that, therefore, it was involuntary. One of the interrogating officers testified that the appellant's eyes *835 were bloodshot and he appeared fatigued, as he was slumped over in his chair; however, he did not believe he was under the influence. Each officer present during the interrogation testified that the appellant appeared to be alert and coherent. In holding that the appellant's statement was voluntary, this Court stated:
"`"`[U]nless intoxication, in and of itself, so impairs the defendant's mind that he is "unconscious of the meaning of his words," the fact the defendant was intoxicated at the time he confessed is simply one factor to be considered when reviewing the totality of the circumstances surrounding the confession.' Carr v. State, 545 So.2d 820, 824 (Ala.Cr.App.1989). `The intoxicated condition of an accused when he makes a confession, unless it goes to the extent of mania, does not affect the admissibility and evidence of the confession but may affect its weight and credibility.' Callahan v. State, 557 So.2d 1292, 1300 (Ala.Cr. App.), affirmed, 557 So.2d 1311 (Ala. 1989)."
"`White v. State, [587 So.2d 1218] (Ala.Cr.App.1990).'
"State v. Austin, 596 So.2d 598, 601 (Ala.Cr.App.1991). See also Rheuark v. State, 601 So.2d 135, 138-39 (Ala.Cr. App.1992).
"`Indeed there was no evidence presented during the course of the trial that showed that the appellant was so intoxicated that he did not know what he was doing. In order for a confession to be inadmissible based on the appellant's intoxication, the "`mind of the appellant must be substantially impaired when the confession was made.'" Mann v. State, 581 So.2d 22 (Ala.Cr.App.1991), quoting Cross v. State, 536 So.2d 155 (Ala.Cr.App. 1988). See also Hubbard [v. State, 500 So.2d 1204 (Ala.Cr.App.), aff'd, 500 So.2d 1231 (Ala.1986), cert. denied, 480 U.S. 940 [107 S.Ct. 1591, 94 L.Ed.2d 780] (1987)]; McCammon v. State, 499 So.2d 811 (Ala.Cr.App. 1986); Moore v. State, 488 So.2d 27 (Ala.Cr.App.1986); Palmer v. State, 401 So.2d 266 (Ala.Cr.App.), writ denied, 401 So.2d 270 (Ala.1981), cert. denied, 455 U.S. 922, 102 S.Ct. 1280, 71 L.Ed.2d 463 (1982). "Where ample evidence ... exists from which the trial judge could conclude that the appellant was not intoxicated to the extent of mania, the admission of a confession for a jury's consideration is not an abuse of discretion." Hubbard, 500 So.2d [at] 1218. The trial court's ruling was not "manifestly wrong."'
"Fuller v. State, 620 So.2d 669, 672 (Ala. Cr.App.1991), affirmed, 620 So.2d 675 (Ala.1993).
"Furthermore, the appellant's claim of intoxication, without evidence that it had reached the stage of mania, is simply a matter to be considered by the jury in its determination of the weight and credibility to be accorded the statement. See White v. State, 587 So.2d 1218, 1227-28 (Ala.Cr.App.1990), affirmed, 587 So.2d 1236 (Ala.1991), cert. denied, 502 U.S. 1076, 112 S.Ct. 979, 117 L.Ed.2d 142 (1992)."
Jackson v. State, supra, at 1326.
In the present case, the State presented sufficient evidence that the appellant's statement was knowingly and voluntarily given. Therefore, despite the appellant's claims concerning the lateness of the hour, as well as the fact that he had been given sleeping pills, the statement was properly admitted into evidence.

VII.
The appellant argues that he was denied his constitutional right to a jury *836 panel composed of a fair cross-section of the community because of the systematic exclusion of cognizable groups. Specifically, the appellant argues that he was prevented from establishing a prima facie case of the violation of the fair cross-section requirement when the trial court denied his motion requesting access to jury polls and other necessary information, as well as a request for funds to hire experts, such as a demographic statistician, to conduct research to establish this alleged violation.
The record indicates that a hearing was held before trial on the appellant's motion. At the hearing, defense counsel argued that Alabama's system of selecting jurors for grand jury duty as well as to serve on trials, by use of driver's license records obtained from the Department of Public Safety, results in the exclusion of certain segments of the population based on social, economic, and racial lines, as well as excluding certain groups because of physical problems. He argued further that "certain persons who may have a certain driving history that cannot have the driver's license, but yet they are still legally able to serve on a jury" were being excluded. Defense counsel stated that they had spoken to a particular expert who estimated that her fee would be approximately $3,000. Defense counsel then stated that, after conducting that study, they would request funds to retain a sociologist to testify as to what effect the exclusion of these certain groups would have on a criminal defendant's trial. Defense counsel further stated that he would expect both experts to indicate that more individuals are excluded from certain zip-code areas that have a higher ratio of black population than from other areas. The trial court responded by asking defense counsel, "How does that fail to meet constitutional muster even if that's true?" Defense counsel responded that they believed the impropriety to be the exclusive use of the driver's list and that "there needs to be other lists in addition to the use of driver's lists to form a more complete list of all persons, and more importantly, a more complete list of those groups that the driver's license systematically excludes." Defense counsel then responded by acknowledging that, although there have been challenges in other courts on this ground, none of these challenges had yet been successful. The trial court responded by ruling, "Well, I'm going to deny your motion at this time. If you wish to present other legal justification for this request, I'll certainly consider that."
The appellant's argument that he was improperly denied his right to prove that a cognizable group was excluded by being denied access to the requested information and the requested funds is without merit, since the method used by Alabama has repeatedly been upheld as constitutional. See, e.g., Stanton v. State, 648 So.2d 638, 640-41 (Ala.Cr.App.1994); Sistrunk v. State, 630 So.2d 147, 149 (Ala.Cr. App.1993); Stewart v. State, 623 So.2d 413, 415 (Ala.Cr.App.1993); Joyce v. State, 605 So.2d 1243, 1245 (Ala.Cr.App.1992). Moreover, the fact that such a list fails to include the name of every qualified person is not a grounds to quash an indictment. Clemons v. State, 720 So.2d 961 (Ala.Cr. App.1996). Therefore, because the appellant was not prejudiced by the trial court's denial of his motion and request, there is no error as to this matter.

VIII.
The appellant argues that the trial court committed reversible error during the sentencing phase of his capital murder trial by allowing the prosecutor to repeatedly question a witness concerning statements made by the appellant's codefendants. Specifically, the appellant refers to the prosecutor's sentencing-phase cross-examination *837 of Dr. Goff concerning his diagnosis of the appellant. The appellant argues that the prosecutor's questions, referring to statements made by the codefendants, called for improper hearsay and that the questions were highly prejudicial.
Dr. Goff was a psychologist employed by the defense to evaluate the appellant. He testified during the guilt stage and the sentencing stage of the trial. The appellant argues that the prosecutor's repeated reference to the codefendants' statements during Dr. Goff's testimony was improper because the witness stated that he had not considered the codefendants' statements in arriving at a diagnosis. Thus, the appellant argues, the State sought to introduce certain information contained in the codefendants' statements, although those statements were not admitted at trial, through the questioning of this witness. However, it is clear when reviewing this questioning that the State's purpose in referring to the codefendants' statements was to reveal the narrow scope of investigation and examination conducted by the expert prior in arriving at a diagnosis. The prosecutor questioned the witness as to whether he had considered certain specifics and details of the offense concerning the appellant's participation and conduct during the offense; some of these specifics had been ascertained through the codefendants' statements. While the expert testified that he had reviewed the appellant's as well as the codefendants' statements, he testified that he had based his diagnosis on information obtained from the appellant's statements and that he had not considered the codefendants' statements at arriving at a diagnosis.
Rule 705, Ala.R.Evid., states that a testifying expert may give an opinion or diagnosis without initially testifying to the underlying facts or data, unless the Court requires otherwise; furthermore, on cross-examination, the expert may be required to disclose the underlying facts or data. The Advisory Committee's Notes to Rule 705, state the following:
"It is left to the cross-examiner to elicit the facts or data on which the opinion is based, and the witness must, if asked, disclose such information. See Polk v. Ford Motor Co., 529 F.2d 259, 271 (8th Cir.), cert. denied, 426 U.S. 907, 96 S.Ct. 2229, 48 L.Ed.2d 832 (1976) (holding that `[t]he weakness in the underpinnings of such opinions may be developed upon cross-examination and such weakness goes to the weight and credibility of the testimony'). The cross-examiner, of course, is under no obligation to bring out such facts or data and, indeed, may limit inquiry solely to facts or data that are unfavorable to the opinion."
In order to test the credibility of an expert's testimony, it is permissible for a challenging party to question the witness concerning the completeness and accuracy of his knowledge of the facts that formed the basis for his opinion.
"It has been recognized that expert opinion evidence may be rebutted by showing the incorrectness or inadequacy of the factual assumptions upon which the opinion is based, `the reasoning by which he progresses from his material to his conclusion,' the interest or bias of the expert, inconsistencies or contradictions in his testimony as to material matters, material variations between the experts themselves, and defendant's lack of co-operation with the expert. Also, in cases involving opinions of medical experts, the probative force of that character of testimony is lessened where it is predicated on subjective symptoms, or where it is based on narrative statements to the expert as to past events not in evidence at the trial. In some cases, *838 the cross-examination of the expert may be such as to justify the trier of facts in not being convinced by him. One or more of these factors may, depending on the particular facts of each case, make a jury issue as to the credibility and weight to be given to the expert testimony; and, in determining whether such issue is raised, due consideration must be given to the fact that the trier of facts has the opportunity to observe the witness if he testifies in person."
Mims v. United States, 375 F.2d 135, 143-44 (5th Cir.1967) (footnotes omitted.) See also United States v. McGraw, 515 F.2d 758, 760 (9th Cir.1975) ("Once the defendant has introduced sufficient expert testimony to support a reasonable doubt as to sanity, the government must: (1) introduce its own expert testimony in rebuttal; or (2) discredit the defendant's expert testimony on cross-examination; or (3) rely upon evidence from which the jury may infer that the defendant's expert testimony depends upon an incorrect view of the facts.").
In United States v. Dube, 520 F.2d 250 (1st Cir.1975), the Court acknowledged the general principle that expert testimony is inconclusive, even if it is uncontradicted, and its credibility and weight are matters for the jury to determine. Id., at 252, citing United States v. Lutz, 420 F.2d 414, 415 (3rd Cir.), cert. denied, 398 U.S. 911, 90 S.Ct. 1709, 26 L.Ed.2d 73 (1970). Thus, the Court stated that such evidence could be rebutted in a number of ways aside from the introduction of countervailing expert opinions. In United States v. Dube, supra, the Court found that the evidence was such that a reasonable man should not have entertained doubts as to the defendant's sanity. The finding was made despite the fact that the defendant introduced the expert testimony of two psychiatrists, who both found the defendant to be a schizophrenic and incapable of conforming his conduct to the requirements of law at the time of the crime, and despite the fact that the State introduced no expert opinions to oppose those introduced by the defendant. The Court noted that the expert's opinions were based on one to two hours of interviews with the defendant and a few hours of intelligence and personality testing. The Court stated, "diagnoses based on such minimal observation are suspect." Id., at 252. The Court further noted that "one of the doctors testified that his diagnosis was largely predicated on the defendant's own description of his thought processes that day, the accuracy and completeness of which are open to grave doubt in the light of the accomplice's testimony. Dube `remembered very little of the incident,' according to [the expert]." Id. at 252, fn. 2.
In the present case, the State was using the factual information from the accomplices' statements in order to challenge the expert witness's basis for his diagnosis, rather than to prove the truth of the matter asserted. Because the State could properly test the credibility of the expert's diagnosis by questioning him concerning the information upon which he based his diagnosis, the prosecutor's questions were introduced for a permissible purpose. "`[N]ot only is there allowable great latitude on cross-examination of a witness, but this latitude is enlarged as to [an] expert witness.'" Clements v. Stewart, 595 So.2d 858, 864 (Ala.1992), quoting Louisville and N.R.R. v. Martin, 240 Ala. 124, 132, 198 So. 141, 147 (1940).

IX.
The appellant argues that the trial court committed reversible error during the sentencing phase of his trial by instructing the jury as to the aggravating circumstance that the offense was especially "heinous, atrocious, or cruel" when compared *839 to other capital murders. Specifically, the appellant argues that the victim's injuries were not unnecessarily torturous ÔÇöthe majority were inflicted postmortem. Because the appellant failed to object on this ground at trial, this matter must be reviewed pursuant to the plain-error rule. Rule 45A, Ala.R.App.P.
"Section 13A-5-49(8), Ala.Code 1975, provides that the following shall be a statutory aggravating circumstance: `The capital offense was especially heinous, atrocious or cruel compared to other capital offenses.' To determine whether an offense is especially `heinous, atrocious or cruel compared to other capital offenses' the Court considers those `conscienceless or pitiless homicides which are unnecessarily torturous to the victim.' See McMillian v. State, 594 So.2d 1253 (Ala.Cr.App.1991); Bradley v. State, 494 So.2d 750 (Ala.Cr.App. 1985), aff'd, 494 So.2d 772 (Ala.1986), cert. denied, 480 U.S. 923, 107 S.Ct. 1385, 94 L.Ed.2d 699 (1987). See also Lindsey v. Thigpen, 875 F.2d 1509 (11th Cir.1989)."
Loggins v. State, 771 So.2d 1070, 1088 (Ala.Cr.App.1999).
Without revisiting the facts and circumstances of the present case, see the trial court's findings of fact supra, this Court has held on the appeal of one of the appellant's accomplice's conviction and sentence, where the same argument concerning this same offense was raised, as follows:
"We reject Loggins's claim that `the trial court's finding that the offense was especially heinous, atrocious or cruel was incorrect as it was based on the post-mortem mutilation of the victim's body.'... The evidence at trial indicated that the manner in which Loggins and his accomplices killed Deblieux was merciless and Sadistic. The findings of the trial court are fully supported by the testimony and evidence and the finding of this aggravating circumstance is fully justified. Therefore, there was no error in the trial court's finding that the state established that the offense was especially heinous, atrocious, or cruel when compared to other capital offenses. See Ex parte McNair, 653 So.2d 353, 360 (Ala.1994), cert. denied, 513 U.S. 1159, 115 S.Ct. 1121, 130 L.Ed.2d 1084 (1995)."
Loggins v. State, 771 So.2d at 1089.
The trial court's instruction to the jury concerning this aggravating circumstance and the trial court's finding that the circumstance existed was proper as it was amply supported by the facts and evidence. See also Thompson v. State, 542 So.2d 1286, 1296 (Ala.Cr.App.1988), aff'd, 542 So.2d 1300 (Ala.1989), cert. denied, 493 U.S. 874, 110 S.Ct. 208, 107 L.Ed.2d 161 (1989) (this Court rejected the appellant's argument that the trial court erred in finding that the offense was especially heinous, atrocious, or cruel because the majority of the victim's wounds were apparently inflicted postmortem, noting that "[t]he facts of this murder, as demonstrated through the appellant's statement, as well as through the other evidence, show a string of torturous and conscienceless acts").

X.
The appellant argues that the trial court committed reversible error during the sentencing phase of his trial by instructing the jury before argument and the taking of testimony, without reinstructing them following closing arguments. Because the appellant did not object at trial, this argument must be reviewed for plain error. Rule 45A, Ala. R.App.P.
The appellant argues that this method of conducting the sentencing phase of the trial violated  13A-5-46(d), Ala.Code *840 1975, and was therefore improper. He further argues that because the prosecutor's inflammatory comments during his closing were the final comments heard before the jury retired to arrive at an advisory verdict, he was unduly prejudiced.
The record in the present case indicates that, after the jury had returned a verdict at the guilt phase, the trial court released the members for the night, but continued discussions with the parties, outside the presence of the jury, concerning the penalty phase of the trial. The following transpired during that discussion:
"THE COURT: Anything else? I usually go ahead and charge before we allow opening statements or presentation of evidence. That seems to make more sense. That way they know why you're doing the things you're doing. I'll probably do that first thing when I bring them out in the morning. Anything else?
"[PROSECUTOR]: In light of that and the Court's instructions, we don't intend to make an opening statement unless the defense does. I mean it seems kind of redundant after the Court's instructions. So if we could have an agreement, we could save some time.
"[DEFENSE COUNSEL]: That's fine."
Thus, the appellant did not object to the trial court's order of the proceedings and appeared to acquiesce. Several days later when the sentencing hearing was to be held, the trial court again discussed matters concerning the sentencing hearing. The trial court stated to the parties, as follows:
"As I said last week, I am going to go ahead and give my jury instructions right off the bat and let the state present their evidence and let the defendant offer any evidence they wish and then we'll have summation by both sides."
The parties then discussed the evidence they intended to admit during the sentencing hearing.
According to  13A-5-46(d), Ala.Code 1975:
"After hearing the evidence and the arguments of both parties at the sentence hearing, the jury shall be instructed on its function and on the relevant law by the trial judge. The jury shall then retire to deliberate concerning the advisory verdict it is to return."
Moreover, Rule 19.1, Ala.R.Crim.P., sets out the order in which a trial should proceed, "unless with agreement of the parties the Court shall direct otherwise" as follows, in pertinent part:
"(i) The parties may make arguments, the district attorney having the opening and closing. If after the opening argument the defendant declines to make argument, the district attorney shall not make further argument.
"(j) The judge shall then charge the jury, as provided in Rule 21."
Thus, there are guidelines for the order of proceedings of a trial in Alabama; however, with the agreement of the parties, the Court may direct otherwise. Moreover, it has long been held in this State that "`[t]he trial court is vested with discretion in the conduct of a trial and appellate courts will not interfere therewith unless it appears that there has been an abuse of discretion.' Townsell v. State, 255 Ala. 495, 498, 52 So.2d 186, 189 (1951)." Houston v. State, 565 So.2d 277, 279 (Ala. Cr.App.1990). See also Tombrello v. State, 421 So.2d 1319, 1322 (Ala.Cr.App.1982); Carson v. State, 49 Ala.App. 413, 272 So.2d 619, 622 (1973).
"It has often been stated by this court that:
"`The trial judge, as a natural consequence of his position and the many *841 duties devolving upon him, is necessarily vested with much discretion in the conduct of the trial of causes, and, unless it clearly appears that there has been an abuse of this discretion, appellate courts will not interfere to control such discretion, but will be presume that one occupying so important a position as that of circuit judge will accord to all litigants in his court a fair and impartial trial provided for in the Constitution of this state....' Dennison v. State, 17 Ala. App. 674, 88 So. 211."
Lockett v. State, 50 Ala.App. 58, 62, 276 So.2d 643, 646 (1973).
Thus, in other states where the trial procedure is established by statute, courts have held that any deviation from the statutory order of proceedings is a matter within the sound discretion of the trial judge "`and any claim that a judge erred in following the statutorily mandated order of proceedings must sustain a heavy burden to demonstrate the unfairness and prejudice....'" State v. Evilsizor, [No. 94CA11, September 28, 1994] (Ohio Cr. App.1994) (unpublished) (wherein the Court held that the defendant had not demonstrated any unfairness or prejudice resulting from the trial judge's decision to forego opening and closing statements, especially where neither party requested to make such a statement.) See State v. Lorenzo, [No. 52640, January 7, 1988] (Ohio Cr.App.1988) (unpublished); Ohio v. Johnson, [C-840346, C-840379, February 27, 1985] (Ohio Cr.App.1985) (unpublished).
"Courtroom procedures for the most part are dictated by statute and court rules, as well as by Constitutional requirements; but, in addition, the trial court has inherent authority, unless otherwise specifically precluded, to control the conduct of the proceedings before it, in order to ensure that the proper decorum and appropriate atmosphere are established, that all parties are treated fairly, and that justice is done. See Guaranty Dev. Co. v. Liberstein, 83 A.2d 669, 671 (D.C.1951) (`[i]t is a well-settled rule that the mode of conducting trials ... [is a] matter [ ] belonging very largely to the practice of the court'); 75 AM. JUR. 2D Trial  180 (1991). Indeed, innovative trial procedures are acceptable as long as they `are administered carefully and meet the requirements of due process.' United States v. Lewis, 230 U.S.App. D.C. 212, 219, 716 F.2d 16, 23, cert. denied, 464 U.S. 996, 104 S.Ct. 492, 78 L.Ed.2d 686 (1983) (sustaining trial of several criminal cases simultaneously before two juries absent evidence indicating dual jury causes specific prejudice to a defendant)."
Hicks-Bey v. United States, 649 A.2d 569, 575 (D.C.App.1994). See also Ohio v. Burge, [No. 14405, January 25, 1995] (Ohio Cr.App.1995) (unpublished). See also Sutherland v. State, 944 P.2d 1157, 1162 (Wyo.1997) (the Court held that the scope and manner, as well as the order, of examining witnesses are matters under the reasonable control of the trial court so as to insure the effective ascertainment of the truth, to avoid needless time consumption, and to effectuate and efficient and orderly trial process).
In the present case, there was no objection to the trial court instructing the jury prior to arguments, either during the discussion held before the sentencing hearing or at the sentencing hearing. Rule 45A, Ala.R.App.P. Thus, the parties seemingly acquiesced to this procedure, making the trial court's actions proper under Rule 19.1, Ala.R.Crim.P. Moreover, even without an affirmative agreement, this action by the trial court did not constitute plain errorÔÇöthe trial court properly instructed *842 the jury on the applicable law, and the record shows that, following the closing arguments and before the jury was released to begin deliberations, the trial court informed them that "[i]f at any time you want me to go back over any of my instructions, be sure and let me know. I will be glad to go over any of that that you have any questions about." Furthermore, despite the fact that the State's closing argument immediately preceded the deliberations, the prosecutor's argument was not unduly inflammatory and there was no plain error. See Carden v. State, 621 So.2d 342, 345-46 (Ala.Cr.App.1992) (the appellant was not denied his constitutional right to a fair trial by the trial court's decision to allow a witness to testify prior to opening statements as "[t]he time and manner of introducing and closing evidence are within the discretion of the trial judge").
Moreover, although this Court and the Alabama Supreme Court have clearly indicated that, especially in a capital murder case, the practice of charging the jury prior to argument without recharging them prior to deliberations should not be condoned, James v. State, 723 So.2d 776 (Ala.Cr.App.1998), writ denied, 723 So.2d 786 (Ala.1998), this court determined that, in light of the circumstances, where the jury was given the opportunity to ask questions prior to retiring, there was no reversible error. Under the facts of the present case, the same applies.

XI.
As required by  13A-5-53, Ala. Code 1975, we address the propriety of the appellant's conviction and sentence of death. The appellant was indicted and convicted of capital murder, see  13A-5-40(a)(1), for intentionally murdering the victim during a kidnapping in the first degree.
The record reflects that the appellant's sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor. See  13A-5-53(b)(1), Ala.Code 1975.
A review of the record shows that the trial court correctly found the existence of two aggravating circumstances: that the capital offense was committed while the appellant was engaged in the commission of a kidnapping, and that the capital offense was especially heinous, atrocious, or cruel compared to other capital offenses. Considering the evidence admitted of the circumstances surrounding the victim's murder, it is abundantly clear that it was unnecessarily torturous, pitiless, conscienceless, extremely wicked, and shockingly evil. The trial court correctly found the existence of two mitigating circumstances: that the appellant had no significant history of prior criminal activity, and that the appellant was 19 years old at the time of the murder. The trial court properly found no nonstatutory mitigating circumstances.
As required by  13A-5-53(b)(2), Ala. Code 1975, this Court must independently weigh the aggravating and mitigating circumstances to determine the propriety of the appellant's death sentence. After an independent weighing, this Court is convinced that the sentence of death is the appropriate sentence.
As  13A-5-53(b)(3), Ala.Code 1975, provides, we must also address whether the appellant's sentence was disproportionate or excessive when compared to sentences imposed in similar cases. The appellant's sentence was neither. See Heath v. State, 455 So.2d 898 (Ala.Cr.App.1983), aff'd, 455 So.2d 905 (Ala.1984), aff'd, 474 U.S. 82, 106 S.Ct. 433, 88 L.Ed.2d 387 (1985); Boyd v. State, 542 So.2d 1247 (Ala. Cr.App.1988), aff'd, 542 So.2d 1276 (Ala.), cert. denied, 493 U.S. 883, 110 S.Ct. 219, *843 107 L.Ed.2d 172 (1989); Neelley v. State, 494 So.2d 669 (Ala.Cr.App.1985), aff'd, 494 So.2d 697 (Ala.1986), cert. denied, 480 U.S. 926, 107 S.Ct. 1389, 94 L.Ed.2d 702 (1987).
We have searched the entire record for any error that might have adversely affected the appellant's substantial rights as to this sentence and conviction and have found none. Rule 45A, Ala.R.App.P. The appellant received a fair trial.
However, the appellant was convicted in Count I of the indictment for capital murder for having intentionally killed Vicki Deblieux during the course of a kidnapping in the first degree and was sentenced to death on that count, but was also convicted of the intentional murder of Vicki Deblieux under Count II of the indictment as a lesser included offense of intentional murder. Therefore, the appellant was placed in jeopardy twice for the same offense. Because the murder that was the subject of Count II was the same murder that was the subject of Count I of the indictment, it was improper to convict and sentence him as to both offenses. As this Court stated in Loggins v. State, 771 So.2d 1070 (Ala.Cr.App.1999), the opinion on the appeal of one of the appellant's accomplices:
"Section 13A-1-8(b), Ala.Code 1975, provides, in part, as follows:
"`When the same conduct of a defendant may establish the commission of more than one offense, the defendant may be prosecuted for each such offense. He may not, however, be convicted of more than one offense if:
"`(1) One offense is included in the other, as defined in Section  13A-1-9....'
"Intentional murder, as defined in  13A-6-2(a)(1), Ala.Code 1975, is an element of the capital offense of murder committed during a kidnapping, as defined in  13A-5-40(a)(1), Ala.Code 1975, and this element must be proven to support a conviction of the capital offense. See Ala.Code 1975,  13A-1-9(a)(1)(`[a]n offense is an included one if... [i]t is established by proof of the same or fewer than all the facts required to establish the commission of the offense charged'). Thus, Loggins's right not be placed in jeopardy twice for the same offense was violated when he was convicted of both the lesser included offense of intentional murder under Count II, which alleged the capital offense of murder committed during a robbery and of the capital offense of murder during a kidnapping under Count I. See Mangione v. State, 740 So.2d 444 (Ala.Cr. App.1998); Borden v. State, 711 So.2d 498, 503 (Ala.Cr.App.1997), aff'd, 711 So.2d 506 (Ala.), cert. denied, 525 U.S. 845, 119 S.Ct. 113, 142 L.Ed.2d 91 (1998); and Coral v. State, 628 So.2d 954, 958 (Ala.Cr.App.1992), aff'd, 628 So.2d 1004 (Ala.1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1387, 128 L.Ed.2d 61 (1994).
"`The double jeopardy transgression in this case implicates the trial court's jurisdiction to render a judgment.... Where the jury returns guilty verdicts for both the capital offense alleged in one Count of the indictment and the lesser included offense of intentional murder of a capital offense alleged in another Count of the indictment, and the same murder was an element of the capital offense and the intentional murder conviction, the trial court should enter a judgment on only one of the offenses.' Borden, 711 So.2d at 503."
771 So.2d at 1092.
In the present case, the appellant was sentenced to death under Count I of the indictment for having committed capital murder, and was sentenced to life imprisonment *844 under Count II of the indictment for having committed intentional murder. Because the same murder was an element of both of these convictions, the trial court was without jurisdiction to enter judgment as to both. Therefore, this cause is due to be remanded with directions for the trial court to vacate the appellant's conviction for intentional murder as a lesser included offense of the capital murder of murder during a robbery, as charged in Count II of the indictment. However, the appellant's conviction under Count I of the indictment for the capital offense of murder during a kidnapping and the resulting sentence of death are hereby affirmed.
AFFIRMED AS TO THE CONVICTION AND SENTENCE IMPOSED UNDER COUNT I OF THE INDICTMENT; REVERSED AS TO THE CONVICTION AND SENTENCE IMPOSED UNDER COUNT II; REMANDED WITH DIRECTIONS.
COBB, BASCHAB, and FRY, JJ., concur.
LONG, P.J., recuses himself.