Rel: January 19, 2024

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# ALABAMA COURT OF CIVIL APPEALS

## OCTOBER TERM, 2023-2024

_____

## CL-2023-0221

_____

## T.D.

## v.

## R.G., on behalf of N.G., a minor child

## Appeal from Madison Circuit Court
## (DR-23-3039)

FRIDY, Judge.

T.D. appeals from a final protection-from-abuse judgment entered by the Circuit Court of Madison County ("the trial court") pursuant to the Protection From Abuse Act, § 30-5-1 et seq., Ala. Code 1975 ("the Act"). We reverse and remand.

## Background

In January 2023, T.D., who was then eighteen years old, and N.G., who was then seventeen years old, were dating. In early January 2023, N.G.'s father R.G. and N.G.'s stepmother took N.G. and her younger sister to the Walt Disney World Resort ("Disney World"). R.G. testified that, after they left for Disney World, he overheard T.D. telling N.G. on her cellular telephone that she and her family were "lame" for leaving on vacation without telling him what time they were leaving. R.G. testified that he had not told N.G. what time they were going to leave because: "As a father, I don't have to give anybody a time to leave. I'm going to leave when I'm ready to leave." According to R.G., T.D. continued to call N.G. while she and her family were at Disney World, and, on at least one occasion, N.G. and T.D. fell asleep during a video conferencing call in with each other at 3:00 or 4:00 in the morning. R.G. said that he read a text message on N.G.'s telephone in which T.D. said that he wanted to commit suicide because N.G. could not be on the telephone with him twenty-four hours a day.

R.G. testified that, when he and his family returned from Disney World, he told N.G. that she needed to take a break from her relationship

with T.D. R.G. testified that he would not allow N.G. to go to T.D.'s house for three or four days after their return from Disney World. R.G. said that, at approximately 10:00 a.m. on the Friday after the family's return from Disney World, N.G. asked him if she could go with T.D. to a basketball game and homecoming ceremony in Clarksville, Tennessee, where N.G.'s biological mother and maternal grandmother live. R.G. said that he had told N.G. that she could not go with T.D. to Clarksville and that she had to stay at home. R.G. testified that, when he returned home at approximately 4:00 p.m. that day, he found that N.G. had left their house without her cellular telephone and automobile keys and that she had left notes addressed to R.G., N.G.'s stepmother, and N.G.'s younger sister in which N.G. informed them that she was running away from home. R.G. testified that he checked the family's security cameras and saw that, at approximately 1:05 p.m. that day, N.G. had gotten into T.D.'s mother's automobile. R.G. testified that, in the note N.G. had left for him, N.G. stated that she had almost tried to kill herself a few days earlier. According to R.G., he then called N.G.'s stepmother and told her what had happened. He said that N.G.'s stepmother subsequently called T.D.'s mother and that T.D.'s mother told N.G.'s stepmother that N.G. was safe

and that there was nothing they needed to worry about. R.G. testified that he searched for N.G. night and day but that he did not learn of her whereabouts until approximately February 8, 2023, when N.G.'s biological mother called him and told him that N.G. was at her house in Clarksville. R.G. said that, during the time that he did not know where N.G. was, he had received messages from people telling him that N.G. was staying with various relatives of T.D.; however, he testified that the police had searched T.D.'s parents' house, where T.D. lives, several times and had searched the houses of relatives of T.D. but that the police did not find N.G. at any of those houses. R.G. admitted that he did not have any evidence indicating that T.D. himself was transporting N.G. to different residences while she was missing. R.G. testified that he requires N.G. to ask his permission before she goes anywhere and that she did not want to live in his house any longer because she did not want to follow his rules.

R.G. testified that, on January 23, 2023, before he learned that N.G. was at her biological mother's residence in Clarksville, he, acting in his capacity as a parent of N.G., had petitioned the trial court to enter a protection-from-abuse order against T.D. In his petition, R.G. alleged

4

that T.D. had trespassed on R.G.'s property, that T.D. had recklessly engaged in conduct that put N.G. at risk of suffering serious injury, and that T.D. had exposed N.G. to drugs. R.G. also alleged that, throughout T.D.'s dating relationship with N.G., he had continuously subjected N.G. to verbal and physical abuse; that T.D. had threatened to commit suicide; that N.G. had also threatened to commit suicide; that T.D. had a gun; that T.D. was unstable and had a criminal record; that T.D. had been expelled from school; and that the local community feared T.D.'s family.

The trial court entered an ex parte protection-from-abuse order on January 23, 2023. Later that same day, a Madison County deputy sheriff personally served T.D. with process at his parents' residence. The trial court initially set the matter for a final hearing on February 8, 2023; however, on February 8, 2023, it continued the final hearing until February 23, 2023, because N.G. had not yet returned to Madison County from her biological mother's residence in Clarksville.

N.G. testified that she wanted to talk to T.D. while she and her family were on vacation at Disney World, that her father had prohibited her from talking to T.D. while they were on vacation, and that she had called T.D. at night to circumvent her father's prohibition of such calls.

N.G. testified that, on the day she ran away from home, she had called T.D.'s mother and asked her to come pick her up. N.G. testified that T.D.'s mother did not know that N.G. was running away from home when T.D.'s mother picked her up. N.G. said that T.D.'s mother thought that N.G. just wanted to come over to their house to wait for T.D. to get off work and take her to Clarksville for the homecoming. N.G. testified that she wanted to run away from her father's house because she considered the situation at her father's house "very toxic" because there was "arguing all the time." N.G. said that she cannot go anywhere without asking her father for permission, even if she just wants to go to the store or to go see her friends. She said that she did not think her father should be so strict. She testified that she contemplated cutting herself because she felt numb and wanted to feel something. She said that she is now in counseling and that the counseling has helped her.

N.G. testified that T.D. had not kidnapped her and that running away from home was solely her idea. She testified that, after she had run away from her father's house, she had decided that she wanted to go to her biological mother's house and that a man she did not know had driven her to Clarksville and dropped her off at her maternal grandmother's

house. She said that she then called her biological mother who came and picked her up at her maternal grandmother's house. N.G. testified that, on the morning of the day she ran away, she had asked her father if she could go to Clarksville because her cousin was in the homecoming court at the high school there and N.G. wanted to see her cousin in the homecoming ceremony. She said that she also wanted to see her biological mother in Clarksville. N.G. testified that R.G. had refused to let her go to Clarksville with T.D.

N.G. testified that T.D. had never abused her. She admitted that she and T.D. had sometimes had minor arguments but that the arguments were never serious and that T.D. had never put his hands on her.

T.D.'s mother testified that, when she picked up N.G., she thought that N.G. just wanted to come over to T.D.'s parents' house to wait for T.D. to get off work and take N.G. to Clarksville. T.D.'s mother said that N.G. had waited at their house until T.D. got home from work about 3:30 p.m. and that T.D. and N.G. had then left. T.D.'s mother testified that, when T.D. and N.G. left that afternoon, she thought they were going to Clarksville.

T.D.'s mother testified that T.D. and N.G. had been dating for three years and that N.G. had come over to their house frequently in the past. T.D.'s mother testified that she did not learn that N.G. had run away from home until later that night when N.G.'s stepmother called her and she later saw on social media that people were saying that T.D.'s mother had kidnapped N.G. T.D.'s mother testified that she had not kidnapped N.G. T.D.'s mother testified that, after T.D. and N.G. left her house that Friday afternoon, N.G. had not been at her house during the time that R.G. did not know where N.G. was. She testified that she did not know where N.G. had been during that period. T.D.'s mother testified that Madison County deputy sheriffs had searched her house eight or nine times during the period when R.G. did not know where N.G. was and that they did not find her there. T.D.'s mother testified that she and her husband had cooperated with the Madison County deputy sheriffs. T.D.'s mother testified that she had not asked T.D. where N.G. was after learning that N.G. had run away.

On February 24, 2023, the trial court entered a final judgment expressly finding that T.D. had committed an act of domestic violence against N.G., making the ex parte protection-from-abuse order a final

8

judgment, and providing that the protection-from-abuse order would remain in effect for three years. T.D. then timely appealed to this court.

## Standard of Review

When a trial court hears ore tenus testimony, its factual findings on disputed evidence are presumed correct and its judgment based on those findings will not be reversed unless the judgment is palpably erroneous or manifestly unjust. See Fadalla v. Fadalla, 929 So. 2d 429, 433 (Ala. 2005). However, that presumption of correctness is rebuttable and may be overcome where there is insufficient evidence presented to the trial court to sustain its judgment. Id. Moreover, the ore tenus rule does not cloak a trial court's conclusions of law or its application of the law to the facts with a presumption of correctness. Id.

## Analysis

On appeal, T.D. argues that the trial court erred in entering a final protection-from-abuse judgment against him because, he says, R.G. failed to prove that he had committed an act of abuse as that term is defined by the Act. Section 30-5-2(1), Ala. Code 1975, defines "abuse" as:

> "An act committed against a victim, which is any of the following:

"a. Arson. Arson as defined under Sections 13A-7-40 to 13A-7-43, [Ala. Code 1975,] inclusive.

"b. Assault. Assault as defined under Sections 13A-6-20 to 13A-6-22, [Ala. Code 1975,] inclusive.

"c. Attempt. Attempt as defined under Section 13A-4-2[, Ala. Code 1975].

"d. Child Abuse. Torture or willful abuse of a child, aggravated child abuse, or chemical endangerment of a child as provided in Chapter 15, commencing with Section 26-15-1, of Title 26, [Ala. Code 1975,] known as the Alabama Child Abuse Act.

"e. Criminal Coercion. Criminal coercion as defined under Section 13A-6-25[, Ala. Code 1975].

"f. Criminal Trespass. Criminal trespass as defined under Sections 13A-7-2 to 13A-7-4.1, [Ala. Code 1975,] inclusive.

"g. Harassment. Harassment as defined under Section 13A-11-8[, Ala. Code 1975].

"h. Kidnapping. Kidnapping as defined under Sections 13A-6-43 and 13A-6-44[, Ala. Code 1975].

"i. Menacing. Menacing as defined under Section 13A-6-23[, Ala. Code 1975].

"j. Other Conduct. Any other conduct directed toward a plaintiff covered by this chapter that could be punished as a criminal act under the laws of this state.

"k. Reckless Endangerment. Reckless endangerment as defined under Section 13A-6-24[, Ala. Code 1975].

"l. Sexual Abuse. Any sexual offenses included in Article 4, commencing with Section 13A-6-60, of Chapter 6 of Title 13A[, Ala. Code 1975].

"m. Stalking. Stalking as defined under Sections 13A-6-90 to 13A-6-94, [Ala. Code 1975,] inclusive.

"n. Theft. Theft as defined under Sections 13A-8-1 to 13A-8-5, [Ala. Code 1975,] inclusive.

"o. Unlawful Imprisonment. Unlawful imprisonment as defined under Sections 13A-6-41 and 13A-6-42[, Ala. Code 1975]."

The only forms of abuse that could possibly apply to the facts of this case are kidnapping and unlawful imprisonment. To prove either first-degree or second-degree kidnapping, a complainant must prove that the defendant "abducted" the victim. See §§ 13A-6-43 and 13A-6-44, Ala. Code 1975; and Grayson v. State, 824 So. 2d 804, 816 (Ala. Crim. App. 1999). To prove that the defendant abducted someone, the complainant must prove that the defendant "restrained" the victim. See § 13A-6-40(2), Ala. Code 1975; Grayson, 824 So. 2d at 816. To prove that the defendant "restrained" the victim, the complainant must prove that the defendant restricted the victim's movements "without consent." See § 13A-6-40(1), Ala. Code 1975; Grayson, 824 at 816. The undisputed evidence in this case indicated that N.G. consensually ran away from R.G.'s home and

11

consensually remained away from R.G.'s home until February 8, 2023, without any "restraint" by T.D. Therefore, the evidence did not establish that T.D. kidnapped N.G.

To prove that a defendant unlawfully imprisoned a victim, a complainant must prove that the defendant "restrained" the victim. See §§ 13A-6-41 and 13A-6-42, Ala. Code 1975. To prove that the defendant "restrained" the victim, the complainant must prove that the defendant restricted the victim's movement without the victim's consent. See § 13A-6-40(1). In the present case, the record does not contain any evidence indicating that T.D. restricted N.G.'s movement without her consent. Therefore, the evidence did not establish that T.D. unlawfully imprisoned N.G.

Because the evidence did not establish that T.D. committed an act of abuse against N.G., the trial court erred in entering a final protection-from-abuse judgment against T.D. Therefore, we reverse the judgment of the trial court and remand the cause for further proceedings consistent with this opinion.

REVERSED AND REMANDED.

Thompson, P.J., and Moore, Edwards, and Hanson, JJ., concur.